**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company,<br><br>Plaintiffs, | Case No. |
| v. | **PLAINTIFFS DEMAND TRIAL BY JURY** |
| Slade Healthcare, Inc.<br>304 Reisterstown Road<br>Pikesville, MD 21208-5312<br>Baltimore County, | |
| Alameda Medical Center, Inc.<br>5670 The Alameda, Suite A<br>Baltimore, MD 21239<br>Baltimore County, | |
| Mount Clare Medical Center, Inc.<br>1261 West Pratt Street, Suite I<br>Baltimore, MD 21223-2666<br>Baltimore County, | |
| Erdman Medical Center, Inc.<br>3401 Erdman Avenue<br>Baltimore, MD 21213-1956<br>Baltimore County, | |
| Liberty Medical & Injury Center, Inc.<br>7034 Liberty Road<br>Gwynn Oak, MD 21207-5801<br>Baltimore County, | |
| Eastside Medical Center, Inc.<br>201 North Washington Street<br>Baltimore, MD 21231-1145<br>Baltimore County, | |
| Mondawmin Medical Center, Inc.<br>2401 Liberty Heights Avenue<br>Baltimore, MD 21215-8019<br>Baltimore County, | |

Yevgeniy Barg )
304 Chamborley Drive )
Reisterstown, MD 21136 )
Baltimore County, )
)
Alexander Morin )
3009 Walnut Avenue )
Owings Mills, MD 21117-1525 )
Baltimore County, )
)
Mikhail Podinovsky (aka Michael Podin) )
20 Brampton Court )
Reisterstown, MD 21136-6432 )
Baltimore County, )
)
Elina Morin )
3009 Walnut Avenue )
Owings Mills, MD 21117-1525 )
Baltimore County, )
)
Michael Mozes Enoch, M.D. )
6948 Copperbend Lane )
Baltimore, MD 21209-1634 )
Baltimore County, )
)
Ronald Mukamal, M.D. )
3100 Stone Cliff Drive )
Baltimore, MD 21209-3868 )
Baltimore County, )
)
Patricia Bey, M.D. )
1701 Pomona Place )
Bowie, MD 20716-1662 )
Prince George's County, )
)
Nava Bazzazieh, D.C. )
10850 Green Mountain Circle )
Columbia, MD 21044-2324 )
Howard County, )
)
Randy Hallman, D.C. )
2700 Fait Avenue )
Baltimore, MD 21224-3834 )
Baltimore County, )
)
Timothy Owen, D.C. )

711 Lee Avenue )
Sykesville, MD 21784-9016 )
Carroll County, )
)
Wayne Sodano, D.C. )
2401 Fairway Oaks Court )
Hampstead, MD 21074-1350 )
Carroll County, )
)
Lance Miller, D.C. )
722 Walker Avenue )
Baltimore, MD 21212-2136 )
Baltimore County, )
)
Tiffany Butler, D.C. )
10236 Hickory Ridge Road, Apt. 201 )
Columbia, MD 21044-4736 )
Howard County, )
)
Ekele Enyinnaya, D.C. )
1803 Beaver Creek Lane )
Frederick, MD 21702-3029 )
Frederick County, )
)
Scot Kampmann, D.C. )
7513 Summer Blossom Lane )
Columbia, MD 21046-1420 )
Howard County, and )
)
Stephen Doyle, D.C. )
2475 Holland Cliffs Road )
Huntingtown, MD 20639-8812 )
Calvert County )
Defendants. )

# COMPLAINT

Plaintiffs State Farm Mutual Automobile Insurance Company ("SFM") and State Farm Fire & Casualty Company ("SFF") for their Complaint against Defendants, allege as follows:

## I. NATURE OF THE ACTION

1. This action seeks to recover money fraudulently obtained from SFM and SFF through the submission of thousands of bills and supporting documentation that are fraudulent for treatment purportedly provided to individuals ("patients") involved in automobile accidents and eligible for benefits ("No-Fault Benefits") under SFM and SFF insurance policies and Maryland's personal injury protection law (the "PIP Law").

2. The bills and supporting documentation are the product of a fraudulent, predetermined treatment protocol (the "Predetermined Treatment Protocol") provided to patients of Alameda Medical Center, Inc. ("Alameda"), Mount Clare Medical Center, Inc. ("Mount Clare"), Erdman Medical Center, Inc. ("Erdman"), Liberty Medical & Injury Center, Inc. ("Liberty"), Eastside Medical Center, Inc. ("Eastside"), and Mondawmin Medical Center, Inc. ("Mondawmin") (collectively, the "Clinics").

3. The Predetermined Treatment Protocol was not designed to legitimately examine, diagnose, and treat patients. Rather, it was designed and carried out to: (a) enable the Defendants to fully exploit and collect the patients' No-Fault Benefits, which were typically $2,500; (b) not refer the patients to any other health care provider for any other reason, including diagnostic testing (e.g., x-rays, MRIs), physical therapy, or consultations by physicians such as orthopedists or neurologists, to avoid potentially having to share the patients' No-Fault Benefits; and (c) keep the total medical expenses to less than $6,000 to "fly under the radar" of, and encourage settlements by, the insurance companies to which claims for payment are made and thereby incentivize the patients' lawyers ("PI Attorneys") to refer more clients to the Defendants.

4. The Predetermined Treatment Protocol involves: (a) initial examinations by medical doctors, chiropractors, or both that are not performed to determine the true nature and extent of patients' injuries and arrive at a treatment plan to address their true needs, but rather to report the same or substantially similar findings to justify a predetermined course of treatment; (b) a treatment plan that consists of the same or substantially the same three or more modalities, plus chiropractic manipulations, provided to almost every patient on almost every visit, regardless of the unique circumstances and needs of each patient, to support at least four separate charges for each visit; (c) discharge of patients from further treatment when the Defendants' charges amount to $6,000 or less, regardless of the patients' conditions at the time of discharge; and (d) submission of documentation to SFM and SFF that falsely represents the examinations and treatment purportedly rendered were medically necessary when, in fact, they were provided, if at all, pursuant to the Predetermined Treatment Protocol and not to address the patients' unique circumstances and needs. As set forth below and further supported by the specific facts set forth in the charts attached hereto as Exhibits 1-6, SFM and SFF have identified more than 4,000 insureds who were treated at the Clinics from April 2010 through the present and made claims for No-Fault Benefits to SFM and SFF. Of those patients, nearly 90% had 15 or fewer visits at the Clinics, 99% had fewer than 20 visits, and more than 99% were discharged before their charges exceeded $6,000 because they purportedly would not benefit from further treatment, or otherwise stopped treating at the Clinics on their own volition.

5. In addition, the Predetermined Treatment Protocol involves the absence of patient referrals for consultations with any other medical professionals such as physiatrists, orthopedists, neurologists, or pain management physicians who have expertise in diagnosing and treating injuries that the patients might actually have, or to any other providers for diagnostic testing such

as x-rays, magnetic resonance imaging ("MRIs"), or nerve conduction velocity tests ("NCVs") and needle electromyography tests ("EMGs"), which might be necessary to diagnose and arrive at an appropriate treatment plan for injuries that patients might actually have. While such referrals to other providers might be in the best interest of the patients, they would not be in the Defendants' best economic interests because any such referrals would likely deplete or exhaust the No-Fault Benefits available to the Defendants if those benefits are also owed to other providers. Indeed, Walter Kozachuk, a medical doctor who treated patients at Mondawmin, among other Clinics, testified in a December 2012 deposition that "Slade," an entity named as a defendant in this action, did not permit patients to be referred for outside services, even when it was in the best interests of the patients.

6. To illustrate the fraudulent, predetermined nature of the examinations, diagnoses, and treatment plans employed by the Predetermined Treatment Protocol, as set forth in paragraphs 78-190 below and in the charts attached hereto as Exhibits 1-18, the Clinics documented substantially the same examinations, diagnoses, and treatment plans for patients, at least some of whom were not in real accidents and were not injured.

7. The participants in this scheme are: (a) the Clinics that submit bills and supporting documentation to SFM and SFF for examinations and treatments purportedly rendered to their patients, which exploit patients' insurance benefits rather than address the patients' true unique needs; (b) Slade Healthcare, Inc. ("Slade"), through which the Clinics solicit and obtain patients to exploit through the Predetermined Treatment Protocol by falsely representing that they provide patients with "a full range of services" based on a "thorough patient history and exam" because "arriving at a treatment plan begins with a comprehensive understanding of [a patient's] life, activities, and symptoms," and the Slade "medical specialists

understand that no two people are quite the same and as such no two injuries or pains manifest themselves identically"; (c) the individual incorporators, directors, officers, and/or owners of the Clinics, Yevgeniy Barg, Alexander Morin, Mikhail Podinovsky (aka Michael Podin), and Elina Morin, all of whom are laypersons, who own, control, and/or direct the activities at Slade and one or more of the Clinics to carry out and profit from the Predetermined Treatment Protocol at multiple locations; and (d) the medical doctors and chiropractors, Michael Mozes Enoch, M.D., Ronald S. Mukamal, M.D., Patricia Bey, M.D., Nava Bazzazieh, D.C., Randy Hallman, D.C., Timothy Owen, D.C., Wayne Sodano, D.C., Lance Miller, D.C., Tiffany Butler, D.C., Ekele Enyinnaya, D.C., Scot Kampmann, D.C., and Stephen Doyle, D.C. (collectively, the "Doctors"), who prescribe, provide, and document (or who prescribed, provided, and documented) the goods and services involved in the Predetermined Treatment Protocol, and do not (or did not) refer patients for consultations with other medical professionals or diagnostic testing, to preserve all available No-Fault Benefits for the Defendants.

8. Each of the participants had a critical role in the scheme, with each needing the others to successfully carry out and profit from the scheme. Specifically, the laypersons, through their overlapping ownership interests and control of Slade and the Clinics, were able to design, direct, and oversee the implementation of the Predetermined Treatment Protocol at the Clinics. Among other things, Slade recruited and funneled to the respective Clinics patients who were the lifeblood of and essential to the economic success of the scheme by advertising the Clinics' services, obtaining information from prospective patients online and through a toll-free number, and arranging appointments for the prospective patients at the respective Clinics. Finally, the Doctors were necessary to the success of the scheme because the laypersons who owned Slade and the Clinics could not prescribe and provide any of the goods and professional services

required to implement and carry out the Predetermined Treatment Protocol, and therefore needed the Doctors to fill that role.

9. As a result of the Predetermined Treatment Protocol: (a) patients were not legitimately examined, diagnosed, and treated for conditions that they may have had; (b) patients were subjected to treatments for conditions that they may not have had; and (c) patients' limited No-Fault Benefits were substantially reduced or exhausted and therefore not available for legitimate treatment patients may have needed.

10. The scheme began as early as April 2010 and has continued uninterrupted since that time.

11. This action seeks a declaratory judgment that SFM and SFF are not liable for any pending bills or bills submitted during the pendency of this action by the Clinics based upon the above-described conduct. This action also asserts common law claims for fraud and unjust enrichment against the Defendants to recover actual damages of at least $7.5 million in No-Fault Benefits paid to the Defendants.

12. Based upon the Defendants' affirmative misrepresentations and acts of concealment, which are set forth below, SFM and SFF did not discover and should not have reasonably discovered the causes of action asserted herein until sometime after the Fall of 2016, after SFM and SFF were able to begin to identify the fraudulent patterns described herein in the bills and supporting documentation across more than 4,000 patients. Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature. Only when the bills and supporting documentation across all claims at issue are viewed together as a whole do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation. *See* Exhibits 1-18.

## II. JURISDICTION AND VENUE

13. Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, excessive of interest and costs, and is between citizens of different states.

14. Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here.

## III. THE PARTIES

### A. Plaintiffs

15. SFM is a corporation incorporated under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois. It is licensed and engaged in the business of insurance in the State of Maryland.

16. SFF is a corporation incorporated under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois. It is licensed and engaged in the business of insurance in the State of Maryland.

### B. Defendants

#### 1. The Clinics

17. From at least April 2010 through the present, the Clinics have knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent for treatment purportedly provided to patients involved in automobile accidents and eligible for No-Fault Benefits under SFM and SFF insurance policies and the PIP Law.

18. The charts attached hereto as Exhibits 1-18 summarize the medically unnecessary goods and services provided to the Clinics' patients pursuant to the Predetermined Treatment Protocol. In each instance, each Clinic knowingly submitted, and/or caused to be submitted, to SFM and SFF bills and supporting documentation that are fraudulent because they are for goods

and services provided pursuant to the Predetermined Treatment Protocol to exploit the patients' insurance benefits, not because these goods and services were medically necessary to address individual patients' unique needs. Each Clinic is discussed next:

**a. Alameda Medical Center, Inc.**

19. Defendant Alameda is a Maryland corporation with its principal place of business at 5670 The Alameda, Suite A, Baltimore, Maryland 21239. Alameda was incorporated by Defendants Mikhail Podinovsky (aka Michael Podin) ("Podinovsky") and Elina Morin ("E. Morin") on November 1, 2000 as Maryland Physical Therapy & Rehabilitation Center, Inc. with its principal place of business at 843 Joshua Tree Court, Owings Mills, Maryland 21117. On January 4, 2001, Maryland Physical Therapy & Rehabilitation Center, Inc. changed its name to Alameda and its address to 5670 The Alameda, Suite A, Baltimore, Maryland 21239.

20. According to the articles of incorporation, Podinovsky was the resident agent, and Podinovsky and E. Morin were originally listed as the directors of Alameda.

21. Since at least 2012, Barg has served as President, Podinovsky has served as Vice President, and E. Morin has served as Secretary of Alameda according to its annually filed corporate reports. Additionally, the 2016 annually filed corporate report lists Michael Podin (aka Podinovsky), E. Morin, and Barg as the directors.

**b. Mount Clare Medical Center, Inc.**

22. Defendant Mount Clare is a Maryland corporation with its principal place of business at 1261 West Pratt Street, Baltimore, Maryland 21223. Mount Clare was incorporated on February 21, 2001 with its principal place of business at 1223 West Pratt Street, Baltimore, Maryland 21223. On March 16, 2001, the principal place of business was changed to 1261 West Pratt Street, Baltimore, MD 21223.

23. According to the articles of incorporation, Mount Clare was incorporated by Podinovsky, E. Morin, and Barg, and Podinovsky was listed as the sole director and resident agent.

24. Since at least 2012, Podinovsky has served as President, Barg has served as Vice President, and E. Morin has served as Secretary of Mount Clare according to its annually filed corporate reports. Additionally, the 2016 annually filed corporate report lists Michael Podin (aka Podinovsky), E. Morin, and Barg as the directors.

### c. Erdman Medical Center, Inc.

25. Defendant Erdman is a Maryland corporation with its principal place of business at 3401 Erdman Avenue, Suite A, Baltimore, Maryland 21213. Erdman was incorporated on January 7, 2002.

26. According to its articles of incorporation, Erdman was incorporated by Defendant Alexander Morin ("A. Morin"), Podinovsky, and Barg, and A. Morin was the sole director and resident agent.

27. Since at least 2012, A. Morin has served as President, Podinovsky has served as Vice President, and Barg has served as Secretary of Erdman according to its annually filed corporate reports. Additionally, the 2016 annually filed corporate report lists Michael Podin (aka Podinovsky), A. Morin, and Barg as the directors.

### d. Liberty Medical & Injury Center, Inc.

28. Defendant Liberty is a Maryland corporation with its principal place of business at 7034 Liberty Road, Gwynn Oak, Maryland 21207. Liberty was incorporated on March 14, 2003 by Svetlana Barg.

29. According to the articles of incorporation, Podinovsky was the resident agent and Svetlana Barg was the sole director. According to Baltimore County real estate records, the

property located at 7034 Liberty Road is owned by YMA Management LLC, a Maryland corporation, the principal office of which is located at 304 Reisterstown Road, Pikesville, Maryland 21208, which is also the principal address for Slade.

30. Since at least 2012, Michael Podin (aka Podinovsky) has served as President, A. Morin has served as Vice President, and Barg has served as Secretary of Liberty according to its annually filed corporate reports. Additionally, the 2016 annually filed corporate report lists Michael Podin (aka Podinovsky), A. Morin, and Barg as the directors.

**e. Eastside Medical Center**

31. Defendant Eastside is a Maryland corporation with its principal place of business at 201 North Washington Street, Baltimore, Maryland 21231. Eastside was incorporated on November 21, 2003 by Barg.

32. Barg is the resident agent and sole director.

33. Since at least 2012, Barg has served as President, and is the sole officer and director according to its annually filed corporate reports.

**f. Mondawmin Medical Center**

34. Defendant Mondawmin is a Maryland corporation with its principal place of business at 2401 Liberty Heights Avenue, Suite 1015, Baltimore, Maryland 21215. Mondawmin was incorporated on February 22, 2005, as Park Heights Medical Center. On January 11, 2010, Park Heights Medical Center, Inc. changed its name to Mondawmin and the address to 4406 Park Heights Avenue, Baltimore, Maryland 21215.

35. Barg is listed as the resident agent and sole director.

36. Since at least 2012, Barg has served as President, and is the sole officer and director according to Mondawmin's annually filed corporate reports.

### 2. The Providers

37. Defendant Ronald S. Mukamal, M.D. ("Mukamal") resides in and is a citizen of Maryland. Mukamal has been licensed by the State of Maryland as a medical doctor since 1993. From at least April 2010 through the present, Mukamal has performed office examinations and prescribed medications, orthotics, and durable medical equipment ("DME") to patients at Alameda, Liberty, Erdman, Mondawmin, Eastside, and Mount Clare pursuant to the Predetermined Treatment Protocol. According to Slade's website, Mukamal "has over 35 years of medical experience, chief of staff, chief of surgery, private practice and injury and disability evaluation experience," and "has been working in Personal Injury Practices for the past 17 years."

38. Defendant Michael Mozes Enoch, M.D. ("Enoch") resides in and is a citizen of Maryland. Enoch has been licensed by the State of Maryland as a medical doctor since 1987. From at least April 2010 through the present, Enoch has performed office examinations and prescribed medications, orthotics, and DME to patients at Alameda, Liberty, Erdman, and Mount Clare pursuant to the Predetermined Treatment Protocol. According to Slade's website, Enoch "has over 25 years of medical experience" and "has been working with Personal Injury Patients for over 10 years."

39. Defendant Patricia Bey, M.D. ("Bey") resides in and is a citizen of Maryland. Bey has been licensed by the State of Maryland as a medical doctor since 1994. From at least April 2012 through the present, Bey has performed office examinations and prescribed medications, orthotics, and DME to patients at Mondawmin and Eastside pursuant to the Predetermined Treatment Protocol. According to Slade's website, Dr. Bey "has over 20 years of medical experience."

40. Defendant Nava Bazzazieh, DC ("Bazzazieh") resides in and is a citizen of Maryland. Bazzazieh has been licensed by the State of Maryland as a chiropractor since 2005. From at least April 2010 through April 2015, Bazzazieh purportedly examined, diagnosed, and treated patients at Alameda, Eastside, Mondawmin, Mount Clare, and Liberty pursuant to the Predetermined Treatment Protocol.

41. Defendant Randy Hallman, DC ("Hallman") resides in and is a citizen of Maryland. Hallman has been licensed by the State of Maryland as a chiropractor since 2005. From at least April 2010 through the present, Hallman has examined, diagnosed, and treated patients at Alameda and Erdman pursuant to the Predetermined Treatment Protocol.

42. Defendant Timothy Owen, DC ("Owen") resides in and is a citizen of Maryland. Owen has been licensed by the State of Maryland as a chiropractor since 2009. From at least July 2010 through the present, Owen has examined, diagnosed, and treated patients at Alameda, Eastside, Erdman, and Liberty pursuant to the Predetermined Treatment Protocol.

43. Defendant Wayne Sodano, DC ("Sodano") resides in and is a citizen of Maryland. Sodano has been licensed by the State of Maryland as a chiropractor since 1985. From at least April 2010 until June 2013, Sodano examined, diagnosed, and treated patients at Alameda pursuant to the Predetermined Treatment Protocol. On December 23, 2008, Sodano signed a Final Consent Order for violation of Md. Health Occ. Ann. § 3-101, *et seq.*, 92005 Repl. Vol. and 2007 Supp. (specifically, § 3-313 (7), (13), (18), (19), (25), and (26)), due to the fact that he had: (1) represented that he maintained certain credentials, when he had not; (2) ordered and billed for diagnostic tests that were not related to a patient's complaints; and (3) provided false information regarding insurance coverage to a patient. As a result of Sodano's Maryland Board of Health Code violations, (1) his license was placed on probation for two years, (2) he was

required to pass the Board's jurisprudence examination, and (3) he was required to pay a $2,500 fine. As early as April 2010, while still on probation, Sodano was working at Alameda.

44. Defendant Lance Miller, DC ("Miller") resides in and is a citizen of Maryland. Miller has been licensed by the State of Maryland as a chiropractor since 2008. From at least April 2010 through the present, Miller has examined, diagnosed, and treated patients at Alameda, Erdman, Mondawmin, Liberty, and Mount Clare pursuant to the Predetermined Treatment Protocol.

45. Defendant Tiffany Butler, DC ("Butler") resides in and is a citizen of Maryland. Butler has been licensed by the State of Maryland as a chiropractor since 2009. From at least May 2011 through the present, Butler has examined, diagnosed, and treated patients at Erdman, Eastside, Mondawmin, and Liberty pursuant to the Predetermined Treatment Protocol.

46. Defendant Ekele Enyinnaya, DC ("Enyinnaya") resides in and is a citizen of Maryland. Enyinnaya has been licensed by the State of Maryland as a chiropractor since 2013. From at least August 2013 through the present, Enyinnaya has examined, diagnosed, and treated patients at Erdman pursuant to the Predetermined Treatment Protocol.

47. Defendant Scot Kampmann, DC ("Kampmann") resides in and is a citizen of Maryland. Kampmann has been licensed by the State of Maryland as a chiropractor since 1995. From at least April 2010 through the present, Kampmann has examined, diagnosed, and treated patients at Mondawmin pursuant to the Predetermined Treatment Protocol.

48. Defendant Stephen Doyle, DC ("Doyle") resides in and is a citizen of Maryland. Doyle has been licensed by the State of Maryland as a chiropractor since 1997. From at least May 2010 through the present, Doyle has examined, diagnosed, and treated patients at Mount Clare pursuant to the Predetermined Treatment Protocol.

**3. Slade Healthcare, Inc.**

49. On March 31, 2010, an entity known as Maryland Injury Treatment Center, Inc. was incorporated by Barg, with Barg, A. Morin, Podinovsky, and Georgiy Barg named as directors. On June 6, 2011, Maryland Injury Treatment Center, Inc. changed its name to Slade. Defendant Slade is a Maryland corporation with its principal place of business at 304 Reisterstown Road, Pikesville, Maryland 21208.

50. Since at least 2012, Barg has served as President, A. Morin has served as Vice President, Georgiy Barg has served as Secretary, and Michael Podin (aka Podinovsky) has served as Treasurer of Slade according to its annually filed corporate reports. Barg, A. Morin, Podinovsky, and Georgiy Barg are directors of Slade.

51. The Slade website (www.sladehealthcare.com) advertises the services provided by the Clinics and provides prospective patients with phone numbers they can call to make appointments at any of Slade's locations. In addition, prospective patients can schedule appointments online by creating an online account on Slade's website.

52. The website provides that Slade's "medical specialists will sit with you when you first arrive to hear your symptoms and to perform a thorough patient history and exam" because "[a]rriving at a diagnosis and treatment plan begins with a comprehensive understanding of your life, activities and symptoms." The website further states that Slade "offer[s] various treatment options" because its "medical specialists understand that no two people are quite the same and as such no two injuries or pains manifest themselves identically."

53. The website identifies each of the Clinics and provides information about the chiropractors and medical doctors who work at them, including many of the medical doctors and chiropractors named as Defendants in this action, and falsely represents Slade will employ various treatment options to address the unique needs of individual patients, to attract and lure

patients into the Clinics where patients are then exploited through the Predetermined Treatment Protocol.

**4. The Incorporators, Officers, and Directors of Slade and the Clinics**

54. Defendant Barg is a resident and citizen of Maryland. Barg incorporated Slade, and also serves as its President, registered agent, and one of its directors. In addition, he is: the President and a director of Alameda; an incorporator, Vice-President, and a director of Mount Clare; an incorporator, Secretary, and a director of Erdman; the incorporator, registered agent, President, and a director of Eastside; the incorporator, President, registered agent, and a director of Mondawmin; and the Secretary and a director of Liberty. In addition, Barg shares the same last name with Svetlana Barg who incorporated Liberty and has also served as a director. Public records indicate they have shared several Baltimore area residential addresses and a Florida residential address. Public records also reveal that Svetlana Barg owns a Mercedes registered to "The Alameda Medical Center." Barg also shares the same last name with Georgiy Barg who was a director of the Maryland Injury Treatment Center, Inc., which is now known as Slade, and is the Secretary and a director of Slade.

55. Defendant A. Morin is a resident and citizen of Maryland. A. Morin was a director of the Maryland Injury Treatment Center, Inc., which is now known as Slade, and is the Vice-President and a director of Slade. In addition, he incorporated and is the registered agent, President, and a director of Erdman and is the Vice President and a director of Liberty.

56. Defendant Podinovsky is a resident and citizen of Maryland. He is also known as Michael Podin. Podinovsky is the Treasurer and a director of Slade. In addition, he is: an incorporator, Vice-President, registered agent, and a director of Alameda; an incorporator, registered agent, President, and a director of Mount Clare; an incorporator, Vice-President, and a director of Erdman; and the President, registered agent, and a director of Liberty. In addition,

Podinovsky shares the same last name with Marina Podinovsky, who has been affiliated with Erdman, and public records indicate they have shared several Baltimore area residential addresses and a Florida residential address.

57. Defendant E. Morin is a resident and citizen of Maryland. E. Morin is an incorporator, Secretary, and a director of Alameda, and an incorporator, Secretary, and a director of Mount Clare. Public records also reveal that E. Morin is associated with 304 Reisterstown Road in Pikesville, Slade's principal place of business. In addition, E. Morin and A. Morin share the same last name and public records indicate they have shared several Baltimore area residential addresses, a Florida residential address, and both appear to currently reside at 3009 Walnut Avenue in Owings Mills, Maryland.

58. In addition, the incorporators, officers, and directors of Slade and the Clinics are associated with neighboring properties in Maryland and Florida. For example, Podinovsky has been associated with 3007 Walnut Avenue in Owings Mills, Maryland, and A. Morin's current residential address appears to be 3009 Walnut Avenue in Owings Mills, Maryland. Similarly, A. Morin, Barg, and Podinovsky are associated with neighboring residential properties in Boca Raton, Florida located at 6030, 6050, and 6060 Verde Trail Road, respectively. Further, A. Morin and Podinovsky were previously associated with 835 and 843 Joshua Tree Court in Owings Mills, respectively, and 843 Joshua Tree Court is the address that appears on Alameda's articles of incorporation.

## IV. ALLEGATIONS COMMON TO ALL COUNTS

### A. First-Party Claims for Payment under the Maryland PIP Law

59. Under Maryland's PIP Law, unless such coverage is affirmatively waived in writing, every insurer that issues, sells, or delivers motor vehicle liability insurance policies in the State of Maryland must provide coverage for the medical, hospital, and disability benefits for

injuries sustained in a motor vehicle accident to: (a) the named insured; (b) any family member who resides in the named insured's household; (c) any individual who is injured while using the insured motor vehicle with the express or implied permission of the named insured; (d) any individual who is injured while occupying the insured motor vehicle as a guest or passenger; and (e) any individual who is injured in an accident that involves the insured motor vehicle while a pedestrian or while operating a vehicle operated by animal or muscular power (such as a bicycle). Md. Code Ins. §§ 19-505(a)(1)-(3), 19-506(a)(1).

60. Under the PIP Law, the minimum medical, hospital, and disability benefits provided by an insurer shall include up to $2,500 of No-Fault Benefits for all reasonable and necessary expenses that arise from a motor vehicle accident and that are incurred within three years after the accident for necessary prosthetic devices and ambulance, dental, funeral, hospital, medical, professional nursing, surgical, and x-ray services. *Id.* § 19-505(b)(2)(i). Insurers are obligated to provide these benefits to each individual in an accident who meets the coverage requirements set forth in paragraph 59 above.

61. No-Fault Benefits are payable without regard to the fault of the named insured in causing or contributing to the motor vehicle accident. *Id.* § 19-507(a)(1).

62. SFM and SFF generally must pay or deny claims for No-Fault Benefits within 30 days after receiving satisfactory proof of the claim, and may be required to pay interest if they fail to pay the amount owed within that time period. *Id.* § 19-508(a) and (c).

**B. The Legitimate Treatment of Patients with Strains and Sprains**

63. The Providers purport to examine, diagnose, and treat patients who have been involved in automobile accidents and complain of neck and/or back pain, among other ailments.

64. For patients who have been in automobile accidents and have complaints of neck and/or back pain, a licensed professional must obtain a detailed history from the patient and perform a legitimate examination to arrive at a legitimate diagnosis.

65. Based upon a legitimate examination and diagnosis, a licensed professional must engage in medical decision-making to design a legitimate treatment plan that is tailored to the unique circumstances and needs of each patient. During the course of treatment, licensed professionals should modify treatment plans based upon the unique progress or lack thereof of the individual patients.

66. Legitimate treatment plans for patients with soft-tissue injuries such as strains and sprains may involve no treatment at all, because many of these kinds of injuries heal without any intervention, or may require a variety of interventions including medications to reduce inflammation and relieve pain, passive modalities, and active modalities.

67. Passive modalities do not require any affirmative effort or movement by the patient. There are many kinds of passive modalities, including: (a) hot/cold packs; (b) ultrasound; (c) electrical stimulation ("e-stim"); (d) manual therapy; (e) massage; and (f) traction.

68. Active modalities require affirmative movement by the patient and include a wide variety of exercises, strengthening, and stretching tailored to the unique circumstances of each patient, including the nature and location of injuries, the physical abilities of the patient, and the patient's response (or lack thereof) to any particular active modality on any day or over time.

69. In legitimate treatment plans, passive modalities are typically used only to the extent necessary to reduce pain and facilitate the patient's ability to perform active modalities,

and active modalities are introduced as soon as practicable to promote the healing and rehabilitation of the injured tissues.

70. While one or more passive modalities may be appropriate on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, the same combination of three or more passive modalities, plus chiropractic manipulations, on nearly every visit would rarely, if ever, be appropriate for any patient, let alone for all patients.

71. The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various treatments, should vary depending on the unique circumstances of each patient, including: (a) the patient's age, social, family, and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment, or lack thereof.

72. Treatment plans should be periodically reassessed and modified based upon the progress of the patient, or lack thereof.

73. Diagnostic tests, such as x-rays, magnetic resonance imaging tests ("MRIs"), nerve conduction studies ("NCVs"), and electromyography tests ("EMGs"), may be medically necessary to diagnose and treat patients with soft tissue injuries and related conditions, and when such tests are performed, the diagnosis and treatment plans should integrate the test results. Similarly, consultations from other medical professionals with expertise in other disciplines, such as orthopedists, neurologists, or pain management doctors, also may be medically necessary for patients with soft tissue injuries and related conditions, and when such consultations are performed, the diagnosis and treatment plans should integrate the results and coordinate the patients' care with the other providers.

74. For example, radicular symptoms are often present for people involved in automobile accidents who complain of pain in their neck or back and, if reported, may support the need for a referral to a neurologist for a consultation and/or providers of diagnostic studies such as MRIs, or NCVs and EMGs – the three diagnostic tests primarily relied upon in the medical community for diagnosing the existence, nature, extent, and specific location of abnormalities in the nerve roots and peripheral nerves that may be causing radicular symptoms.

75. Patients should be discharged from treatment when they have reached maximum medical improvement, such that no further treatment is likely to benefit the patient.

76. The above-described process of examination, diagnosis, and treatment must be appropriately documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patient whose care and condition necessarily depends on the documentation of this information; and (d) payors such as SFM and SFF who are obligated to pay for necessary treatment.

77. As described below, patients at the Clinics were not legitimately examined, diagnosed, or treated for their unique conditions and needs. Instead, they were subjected to the Predetermined Treatment Protocol where they received three or more modalities, plus chiropractic manipulations, on nearly every visit, regardless of each patient's unique conditions, needs, and progress, or lack thereof. *See* Exhibits 1-6. Furthermore, the pervasive patterns in the documentation of the examinations, diagnoses, and treatment plans submitted to SFM and SFF by the Clinics are not credible and reflect services that either were not performed or were performed pursuant to a Predetermined Treatment Protocol designed to take advantage of the patients' No-Fault Benefits and support "under the radar" bodily injury claims ("BI Claims"), not

because these services were medically necessary to address the unique conditions and needs of each patient. *See* Exhibits 7-18.

**C. Defendants' Predetermined Treatment Protocol**

78. Patients initially appear at the Clinics, frequently within a few days or less of their automobile accidents, often without a prior emergency room visit. At each Clinic, patients are typically subjected to initial examinations by a medical doctor, a chiropractor, or both. Regardless of which provider performs the initial examination, virtually every patient is diagnosed with a sprain or strain of the neck and/or back, and sometimes other diagnoses. However, patients are rarely referred to other medical providers either for diagnostic testing or consultations. Although a referral to another provider might be in the best interest of the patients, it would not be in the Clinics' best economic interest because it would reduce the No-Fault Benefits available to the Clinics by steering the patients to other providers who could submit bills and collect No-Fault Benefits.

79. Thereafter, the chiropractors and doctors at each respective Clinic prescribe virtually identical treatment plans for most patients, consisting of substantially the same combination of three or more modalities, plus chiropractic manipulations. *See* Exhibits 7-18. The treatment consists of mostly passive modalities, which are not phased out over time as would be expected in a legitimate treatment setting. To the extent a given Clinic also purportedly administers any active modalities, such as therapeutic exercises, the records fail to adequately document the nature, frequency, or duration of the exercises performed or document patient response or progress. In addition, the medical doctors routinely prescribe medications, orthotics, and DME, which are dispensed at the Clinics and billed through Mid-Atlantic Medical Supply & Equipment.

80. Treatment typically consists of the same or substantially the same combination of three or more modalities, plus chiropractic manipulations, on every date of service, with an average of about 11 dates of service for each patient. *See* Exhibits 1-6. Patients are subjected to the Predetermined Treatment Protocol not because the treatment is medically necessary, but because, by subjecting patients to multiple modalities on every date of service, the Clinic is able to submit multiple charges for each date of service which, in turn, enables the Clinic to run through patients' No-Fault Benefits relatively quickly, generate charges that are sufficient to support low dollar BI Claims designed to "fly under the radar of" and encourage settlements by SFM and SFF, and discharge the patients to make room for new patients who can be subjected to the Predetermined Treatment Protocol.

81. The Doctors then regularly discharge the patients with a finding that the patients have achieved maximum medical improvement ("MMI"), without regard to the patients' actual conditions or the likelihood that they might benefit from further treatment. *Id.*

82. The MMI findings represent that the patients have achieved the maximum benefits from treatment and are not likely to benefit from additional treatment from the Clinics. This is then used as a pretext for discharging the patients from further treatment. The MMI findings are made not because the patients have achieved maximum medical improvement and are not likely to benefit from further treatment at the Clinics, but because the Clinics know that they have exhausted or substantially depleted the patients' limited No-Fault Benefits and limited their charges to an amount that will support the limited BI Claims described above. Indeed, many of the patients are discharged at MMI, despite the fact that documentation from the Clinics reflects that they still have pain and other symptoms. *See* Exhibits 1-6.

83. Furthermore, for each Clinic, SFM and SFF have identified numerous claims in which multiple individuals were purportedly in the same accident, began treatment at the same Clinic on or about the same date, within days of the accident, were subjected to the same or nearly identical treatment, and were discharged on or about the same date. Such uniformity of treatment is not credible and further underscores the predetermined nature of the treatment at each Clinic. These claims are highlighted on Exhibits 1-6.

**1. Alameda**

**a. The Chiropractors' Initial Examinations at Alameda**

84. When patients at Alameda receive an initial examination from a chiropractor, the purported results are documented in written reports. *See* Exemplar Reports at Exhibit 19. From at least April 2010 to June 2013, Defendant Sodano was the main chiropractor performing initial examinations at Alameda. From approximately July 2013 to May 2016, the main chiropractor conducting initial examinations at Alameda was Defendant Hallman. From approximately August 2016 to the present, Defendant Miller has been the main chiropractor performing initial examinations at Alameda.

85. The Alameda chiropractors' written reports typically document patients as purportedly reporting pain in their necks and/or backs, with some also purportedly reporting complaints in other areas of the body. In addition, beginning in approximately July 2010, the Alameda chiropractors also began to routinely document that patients did not report any radicular symptoms (i.e., pain that shoots down an extremity), which, as discussed above (¶ 74), one would expect to find in at least some patients in a legitimate clinical setting where patients who have been in automobile accidents are complaining of neck and back pain. *See* Exhibit 7, "Complaints" Column. Documenting the absence of such symptoms enabled Alameda to avoid referring patients for consultations with other medical providers or for diagnostic testing.

86. In addition to documenting patients' purported subjective complaints, the chiropractors at Alameda also purport to conduct physical examinations as part of their initial examinations, including examinations of the cervical, thoracic, and/or lumbar regions of the spine, the results of which are purportedly the same or similar across multiple patients. *See* Exhibit 7.

87. Based on the patients' subjective complaints and the results of their physical examinations, the chiropractors at Alameda purport to diagnose virtually every patient with a sprain or strain of the neck or back, among other diagnoses, and recommend a virtually identical, non-individualized treatment plan for nearly every patient. *See* Exhibit 7.

88. Specifically, the treatment plan consists of the following recommendations for nearly every patient: spinal manipulation, moist heat, cryotherapy, and rehabilitative exercises, in addition to other modalities. *Id.* Beginning in or about January 2013, virtually every patient is recommended to receive interferential heat in addition to the other modalities. *Id.* In approximately July 2013, when Defendant Hallman became the primary chiropractor conducting initial examinations at Alameda, he rarely recommended traction, but began recommending counseling in activities of daily living ("ADLs") for virtually every patient. *Id.* As discussed above, it is incredible that virtually every patient required the same or substantially the same treatment recommendations. *See supra* ¶¶ 63-77.

**b. The Medical Doctors' Initial Examinations at Alameda**

89. Patients at Alameda are also typically subjected to separate, initial examinations conducted by medical doctors, the results of which are purportedly documented in written reports. *See* Exemplar Reports at Exhibit 20. Defendants Enoch and Mukamal are the medical doctors who perform initial examinations at Alameda. Regardless of which doctor performs the

initial examination, the patterns in the documentation and subsequent treatment are – implausibly – virtually the same.

90. Specifically, most patients purportedly complain of pain in the neck and/or back, with a large number of patients also purportedly complaining of headaches and/or symptoms in other parts of the body.

91. The medical doctors at Alameda also purport to conduct physical examinations, including examinations of the neck, mid back, and/or lower back. Where patients have abnormal examinations, the results are often the same or similar across numerous patients. *See* Exhibit 8. For example, patients with abnormal examinations are reported to have spasm or tenderness and restricted and/or painful range of motion ("ROM"), but patients are also documented as purportedly exhibiting no swelling or ecchymoses (discoloration as a result of bruising) in spinal regions, or their reports are silent with respect to these findings. *Id.*

92. The fact that virtually no one is reported to have swelling or ecchymoses in spinal regions is not credible. Of the approximately 609 patients who treated at Alameda, all but 15 of them began their treatment within 21 days following their reported automobile accident. Given that such a large number of patients began their treatment at Alameda so soon after their purported injuries and purportedly had strains and sprains in their necks and/or backs, among other diagnoses, it is highly implausible that virtually no one exhibited any swelling or bruising in the injured area.

93. Beginning in approximately October 2010 until approximately May 2016, virtually every patient at Alameda was also subjected to an orthopedic test known as a Straight Leg Raise ("SLR") during their initial medical examination. *See* Exhibit 8.

94. The SLR is used by medical doctors and chiropractors to determine whether nerve root tension is the cause of a patient's low back pain. The test is performed by having the patient lay on his or her back, and the doctor separately lifts each leg while the knee remains straight. If the patient experiences pain when the leg is lifted, the test is positive and indicates the presence of nerve root tension, often associated with a disc protrusion and/or a radiculopathy. When an SLR is positive, the doctor should record the affected leg and record in degrees the angle at which the test elicited pain. In addition, a positive test result should lead to a referral for at least some patients for an outside consultation and/or diagnostic testing.

95. Here, virtually every patient purportedly subjected to an SLR reportedly had the same negative result. *See* Exhibit 8. As discussed above, the providers at Alameda (and indeed all of the Clinics) virtually never make referrals for outside consultations or diagnostic testing. *See supra* ¶¶ 5, 78. Thus, by documenting virtually every patient had a negative SLR, the doctors are documenting the absence of symptoms or findings that would support such referrals.

96. Further, in a patient population as large as at issue here, where such a large number of patients purport to suffer from back pain following an automobile accident, it is extremely unlikely that virtually no one has a positive SLR. Indeed, in a legitimate clinical setting of patients complaining of low back pain following an automobile accident, at least some patients would be expected to have a positive SLR. Yet, of the approximately 309 Alameda patients who were subjected to the SLR by doctors at Alameda, only four patients were reported to have positive results. *See* Exhibit 8.

97. Further, the doctors purport to reach diagnoses at the conclusion of their initial examinations, with virtually every patient being diagnosed with a sprain or strain of one or more regions of the spine. *See* Exhibit 8. The doctors at Alameda also diagnose a large number of

patients with post-traumatic headaches and other conditions, but give the same treatment plan regardless of patients' unique needs. *Id.*

98. Specifically, Enoch and Mukamal recommend virtually every patient should receive chiropractic care and perform exercises; however, the reports fail to document the specific exercises that are purportedly appropriate for each patient. *See* Exhibits 8, 20. In essence, the medical doctors' examinations and treatment plans serve merely to provide the imprimatur of a medical doctor for the predetermined course of treatment that most patients ultimately receive.

99. The Alameda doctors also recommend that virtually every patient receives medication and a heating pad. *See* Exhibit 8. To the extent patients require a prescription medication, the prescription is written and the medications are dispensed at Alameda, as are the heating pads. The medications and DME are billed through Mid-Atlantic Medical Supply & Equipment.

**c. The Predetermined Treatment Protocol at Alameda**

100. Following their initial examinations, patients at Alameda are subjected to a Predetermined Treatment Protocol consisting of the same or substantially the same combination of four or more modalities for virtually every patient on virtually every date of service. *See* Exhibit 1. Specifically, the Predetermined Treatment Protocol at Alameda consists of: hot packs, e-stim, chiropractic manipulations, mechanical traction, and therapeutic exercise, or at least four of these modalities on virtually every visit. *Id.* The treatment is not individualized or adjusted over the course of treatment to address patients' unique response to treatment or progress (or lack thereof). With respect to the therapeutic exercises, the documentation is deficient. To the extent the handwritten notes are legible at all, the provider generally makes a notation regarding the exercise and the amount of time it was performed, but fails to document any clinical

reasoning such as why a particular exercise was performed or how the patient responded. Further, the passive modalities described above are utilized on virtually every visit throughout the entire course of care and are not phased out over time as one would expect in a legitimate setting. *See* Exhibit 1.

101. Patients are subjected to the Predetermined Treatment Protocol not because the treatment is medically necessary, but because, by subjecting virtually every patient to four or more modalities on virtually every date of service, Alameda is able to submit multiple charges for each date of service which, in turn, enables Alameda to run through patients' No-Fault Benefits relatively quickly, generate sufficient charges to support BI Claims of no more than $15,000, and discharge the patients to make room for new patients who can be subjected to the Predetermined Treatment Protocol. SFM and SFF have identified 609 of their insureds who received treatment at Alameda between April 2010 and the present. Of those, the average number of modalities each patient received on virtually every treatment date was four or more modalities. In addition, only 30 Alameda patients had more than 15 treatment dates, only three had more than 20 treatment dates, and only eight patients' total bills exceeded $6,000.

102. Finally, SFM and SFF have identified numerous claims, highlighted on Exhibit 1, in which multiple individuals who were purportedly in the same accident began treatment at Alameda on or about the same date, within days of the accident, were subjected to the same or nearly identical treatment, and were discharged on or about the same date. For example, patients A.W. and E.W. were reportedly in an accident on May 27, 2010. *Id.*, Patient Nos. 16-17. Both began treatment at Alameda on May 27, 2010, received the same treatment, and were discharged on the same date, June 28, 2010, *id.*, despite reporting at least some different complaints. Similarly, patients B.R., N.D., and S.D. were reportedly in an accident on December 9, 2010.

*Id.*, Patient Nos. 76-78. All three began treatment at Alameda on December 14, 2010, received virtually identical treatment, and were discharged on the same date, January 11, 2011, *id.*, despite reporting at least some different complaints. Such uniformity of treatment among passengers from the same accident is simply not credible and further underscores the fraudulent nature of the Clinic's scheme.

**2. Mount Clare**

**a. The Chiropractors' Initial Examinations at Mount Clare**

103. When patients at Mount Clare receive initial examinations from a chiropractor, the purported results are documented in written reports. *See* Exemplar Reports at Exhibit 21. From at least May 2010 to the present, Defendant Doyle performed the majority of chiropractic initial examinations at Mount Clare, though Defendant Miller, among others, has also performed initial examinations at Mount Clare.

104. The Mount Clare chiropractors' written reports almost always document patients as purportedly reporting pain in their necks and/or backs, with a significant number of patients also purportedly reporting headaches and complaints in other parts of the body.

105. In addition, the chiropractors at Mount Clare purport to conduct physical examinations, including examinations of the cervical, thoracic, and/or lumbar regions of the spine. For patients with abnormal examinations, the results are frequently the same or similar across nearly all patients. *See* Exhibit 9a. For example, from approximately April 2010 to February 2016, virtually every patient with an abnormal physical examination was found to exhibit muscle tightness and/or joint fixation in the same spinal levels, C1-C7 (or C2-C7) for cervical examinations, T1-T12 for thoracic examinations, and L1-L5 for lumbar examinations. *Id.* These spinal levels represent essentially the entirety of each spinal region. Beginning in approximately March 2016, the chiropractors at Mount Clare no longer report findings regarding

muscle tightness. Instead, the chiropractors now find that virtually every patient with abnormal physical examinations exhibits joint fixation, muscle spasms or tenderness, and/or decreased ROM, and they virtually never specify the spinal levels at which such conditions are found. *Id.*

106. In addition, virtually every patient is reported to have positive results on cervical distraction, shoulder depression, cervical compression, maximum cervical compression, Kemp's, and/or Milgram's tests. *See* Exhibit 9a. It is not credible that virtually every patient would have positive results when subjected to one or more of these tests, and virtually no patients were reported to have negative results. In any event, in a legitimate clinical setting, these results should be taken into account when recommending a treatment plan. But, at Mount Clare, nearly every patient receives the same or substantially the same treatment plan and treatment modalities regardless of their physical examination results. *See* Exhibits 2, 9b.

107. Purportedly based on the patients' subjective complaints and results of their physical examinations, the chiropractors at Mount Clare purport to diagnose virtually every patient with the same or similar conditions, namely a sprain or strain of the neck and/or back, among other diagnoses, and recommend the same or substantially the same treatment plan for nearly every patient. *See* Exhibit 9b.

108. Specifically, the Mount Clare chiropractors recommend: physiotherapy, spinal manipulations, and rehabilitative exercises, for virtually every patient, as well as a combination of passive modalities, such as manual trigger point therapy, interferential heat, e-stim, moist heat, and/or ice, and occasionally, traction, with a majority of patients also receiving a recommendation for counseling in ADLs. *See* Exhibit 9b. Additionally, the prognosis is "guarded" for virtually every patient. *Id.* As discussed above, it is incredible that virtually every

patient required the same or substantially the same treatment recommendations. *See supra* ¶¶ 63-77.

**b. The Medical Doctors' Initial Examinations at Mount Clare**

109. Patients at Mount Clare are also typically subjected to initial examinations conducted by medical doctors, the results of which are purportedly documented in written reports. *See* Exemplar Reports at Exhibit 22. Defendants Enoch and Mukamal are the main medical doctors performing initial examinations at Mount Clare. Regardless of the doctor, for most patients, the non-credible patterns in the documentation and subsequent treatment are virtually the same.

110. Specifically, most patients purportedly complain of pain in the neck and/or back, with some patients also reportedly complaining of headaches and symptoms in other parts of the body.

111. The medical doctors at Mount Clare also purport to conduct physical examinations, including physical examinations of the neck, mid back, and/or lower back. Where patients have abnormal findings, the results are the same or similar across virtually every patient, namely spasms or tenderness and restricted range of motion in one or more spinal regions. *See* Exhibit 10.

112. Like the patients at Alameda, the majority of patients at Mount Clare are also subjected to a SLR. And, also like the patients at Alameda, the SLR results are reportedly negative for virtually every patient at Mount Clare who was subjected to the test, again allowing the doctors to document the absence of symptoms or findings that might support referrals for outside consultations or diagnostic testing. *See* Exhibit 10.

113. Further, the doctors purport to reach diagnoses at the conclusion of their initial examinations, with virtually every patient being diagnosed with a sprain or strain of one or more

regions of the spine. While the doctors also diagnose the majority of patients with post-traumatic headaches and other conditions, the doctors prescribe virtually identical treatment plans regardless of any unique patient diagnoses or needs. *See* Exhibit 10.

114. Specifically, Enoch and Mukamal recommend that virtually every patient receives "pharmacological therapy" or medication, chiropractic care, and a heating pad. In addition, beginning in approximately June 2016, Enoch and Mukamal recommend to virtually all patients that they perform exercises; however, the reports fail to document the specific exercises that are purportedly appropriate for each patient. *Id.* To the extent patients require a prescription medication, orthotics, or DME, the prescription is written and the medications, orthotics, and DME are dispensed at Mount Clare and billed through Mid-Atlantic Medical Supply & Equipment.

115. Because the treatment plan and the treatment modalities patients receive are predetermined and the same or substantially the same for virtually every patient, nothing that occurs at the initial examinations has any bearing on patients' treatment, and accordingly, the initial examinations are not legitimate or medically necessary.

#### c. The Predetermined Treatment Protocol at Mount Clare

116. Following their initial examinations, patients at Mount Clare are subjected to a Predetermined Treatment Protocol consisting of the same or substantially the same combination of four or more modalities for virtually every patient on virtually every date of service, specifically consisting of hot packs, e-stim, chiropractic manipulations, mechanical traction, and manual therapy, or at least four of these modalities on virtually every visit. *See* Exhibit 2. Similar to the predetermined treatment at Alameda, the treatment at Mount Clare is likewise not individualized or adjusted over the course of treatment to address patients' unique response to treatment or progress (or lack thereof). Further, the passive modalities identified above are

utilized on virtually every visit throughout the entire course of care and are not phased out over time as one would expect in a legitimate setting. Finally, Mount Clare rarely bills for active modalities, such as therapeutic exercise, which promote the rehabilitation and healing of soft tissue injuries. *Id.*

117. Patients are subjected to the Predetermined Treatment Protocol not because the treatment is medically necessary, but because, by subjecting virtually every patient to four or more modalities on virtually every date of service, Mount Clare is able to submit multiple charges for each date of service which, in turn, enables Mount Clare to run through patients' No-Fault Benefits relatively quickly, generate sufficient charges to support BI Claims of no more than $15,000, and discharge the patients to make room for new patients who can be subjected to the Predetermined Treatment Protocol. In sum, SFM and SFF have identified 635 of their insureds who were treated at Mount Clare between April 2010 and the present. Of those, each patient on average received four or more modalities on virtually every treatment date. Only 8 Mount Clare patients had more than 15 treatment dates, only one had more than 20 treatment dates, and only three patients' total bills exceeded $6,000.

118. Further, SFM and SFF have identified numerous claims, highlighted on Exhibit 2, in which multiple individuals were purportedly in the same accident, began treatment at Mount Clare on or about the same date, within days of the accident, were subjected to the same or nearly identical treatment, and were discharged on or about the same date. For example, patients D.M., R.M., and Z.M. were purportedly in an accident on July 29, 2010. *Id.*, Patient Nos. 26-28. All three began treatment at Mount Clare on August 2, 2010, received virtually identical treatment, and were discharged on the same date, August 31, 2010, *id.*, despite reporting at least some different complaints. Similarly, patients D.S. and L.S. were purportedly in an accident on

September 17, 2011. *Id.*, Patient Nos. 148-49. Both began treatment at Mount Clare on September 20, 2011, received the same treatment, and were discharged on the same date, October 27, 2011. *Id.* Such uniformity of treatment among passengers from the same accident is simply not credible and further underscores the fraudulent nature of the Clinic's scheme.

### 3. Erdman

#### a. The Chiropractors' Initial Examinations at Erdman

119. When patients at Erdman receive an initial examination from a chiropractor, the results are documented in written reports. *See* Exemplar Reports at Exhibit 23. From at least April 2010 to the present, chiropractors who performed initial examinations at Erdman include Defendants Hallman, Miller, and Enyinnaya.

120. Like the initial examination reports of the other Clinics, the Erdman chiropractors' written reports typically document patients as reporting pain in their necks and/or backs, with patients frequently reporting headaches or other non-spinal symptoms. The Erdman chiropractors also routinely document that patients deny numbness or tingling in their extremities. *See* Exhibit 11. This is noteworthy because, similar to a positive SLR test, numbness and tingling in an extremity are symptoms suggestive of a radiculopathy or other nerve pathology, which may indicate the need for a consultation with another medical professional or for diagnostic testing. Documenting the absence of such symptoms or findings avoids the potential need for such referrals.

121. In addition to documenting patients' purported subjective complaints, the chiropractors at Erdman purport to conduct physical examinations, including of the cervical, thoracic, and/or lumbar regions of the spine. The documented results of these examinations are the same or similar across patients, which include muscle pain or tenderness, hypertonicity, and/or associated intersegmental dysfunction. *See* Exhibit 11.

122. As part of the physical examination, many patients are subjected to orthopedic tests, including cervical compression, shoulder depression, maximum cervical compression, Soto Hall, and/or Kemp's tests. Regardless of the documented results of these tests, the treatment plan and treatment modalities are the same for virtually everyone. *See* Exhibit 11*; see also* Exhibit 3.

123. Purportedly based on the patients' subjective complaints and results of their physical examinations, the chiropractors at Erdman diagnose virtually every patient with a sprain or strain of the neck or back, among other diagnoses, and then recommend the same, non-individualized treatment plan for virtually every patient. *See* Exhibit 11.

124. Specifically, the Erdman chiropractors recommend: physiotherapy, spinal manipulation, interferential heat or e-stim, ice, rehabilitative exercises, cryotherapy, moist heat, and counseling in ADLs. *Id.* As discussed above, it is incredible that virtually every patient required the same treatment plan. *See supra* ¶¶ 63-77.

**b. The Medical Doctors' Initial Examinations at Erdman**

125. Patients at Erdman are also typically subjected to separate initial examinations conducted by medical doctors, the results of which are purportedly documented in written reports. *See* Exemplar Reports at Exhibit 24. Defendants Enoch and Mukamal are the main medical doctors who perform initial examinations at Erdman. Regardless of which doctor performs the initial examination, however, the patterns in the documentation and subsequent treatment are virtually the same.

126. For example, most patients purportedly complain of pain in the neck and/or back, with a large number of patients also purportedly complaining of headaches and symptoms in their extremities.

127. The medical doctors at Erdman purport to conduct physical examinations, including physical examinations of the cervical, thoracic, and/or lumbar regions of the spine. The documented patterns in the results of these examinations are not credible. *See* Exhibit 12. For example, patients with abnormal examinations are virtually always reported to have spasms or tenderness, and, when specified, at the same spinal levels—C2 to C7 for cervical exams, T1 to T12 for thoracic exams, and L1 to L5 for lumbar exams. *Id.*

128. ROM is virtually always restricted in patients with abnormal examinations. ROM is also described as being "within limited limits" in the majority of patients. *See* Exhibit 12. Further, patients are only documented as purportedly exhibiting no swelling or ecchymoses, or their reports are silent with respect to these findings. *Id.*

129. From their initial examinations, the Erdman doctors purport to diagnose virtually every patient with a sprain or strain of one or more regions of the spine. *See* Exhibit 12. In addition, while the doctors at Erdman diagnose the majority of patients with post-traumatic headaches and "traumatic injuries" to other parts of the body such as knees and shoulders, the treatment plan does not vary to address any patient's unique needs. *Id.* Nor are patients referred for consultations to specialists, such as neurologists or orthopedists, or for diagnostic testing, to address potentially serious conditions that are documented, including post-traumatic headaches.

130. Instead, the medical doctors ultimately prescribe virtually identical treatment plans to virtually every patient. *See* Exhibit 12. Enoch and Mukamal recommend that virtually every patient receives medication and chiropractic care, performs exercises, and receives a heating pad. *Id.* However, the reports fail to document the specific exercises that are purportedly appropriate for each patient. *See* Exhibit 24. With respect to the medications and

DME prescribed by the Erdman doctors, they are dispensed at Erdman and billed through Mid-Atlantic Medical Supply & Equipment. *See* Exhibit 12.

131. Because the treatment plan and the treatment modalities patients receive are predetermined and virtually identical for every patient, nothing that occurs at the initial examinations has any bearing on the patients' treatment, and accordingly, the initial examinations are not legitimate or medically necessary.

**c. The Predetermined Treatment Protocol at Erdman**

132. Following their initial examinations, patients at Erdman are subjected to a Predetermined Treatment Protocol consisting of four or more of the same or substantially the same modalities for virtually every patient on virtually every date of service. *See* Exhibit 3. Specifically, the Predetermined Treatment Protocol at Erdman consists of: hot packs, e-stim, chiropractic manipulations, mechanical traction, and therapeutic exercise, or at least four of these modalities on virtually every visit. *Id.* These modalities, once again, are not individualized or adjusted over the course of treatment to address patients' unique response to treatment or progress (or lack thereof). With respect to the therapeutic exercises, to the extent the handwritten documentation is legible at all, it is deficient because, at most, the provider notes the exercise and the number of sets and time it was performed, but fails to document any clinical reasoning such as why a particular exercise was performed or how the patient responded. Further, the passive modalities described above are utilized on virtually every visit throughout the entire course of care and are not phased out over time as one would expect in a legitimate setting.

133. Patients are subjected to the Predetermined Treatment Protocol not because the treatment is medically necessary, but because by subjecting virtually every patient to four or more modalities on virtually every date of service Erdman is able to submit multiple charges for

each date of service which, in turn, enables Erdman to run through patients' No-Fault Benefits relatively quickly, generate sufficient charges to support BI Claims of no more than $15,000, and discharge the patients to make room for new patients who can be subjected to the Predetermined Treatment Protocol. In total, between April 2010 and the present, SFM and SFF have identified 802 of their insureds who were treated at Erdman. Of those, each patient, on average, received four or more modalities on virtually every visit. Only 41 Erdman patients had more than 15 treatment dates, only two had 20 or more treatment dates, and only seven patients' total bills exceeded $6,000.

134. Finally, SFM and SFF have identified numerous claims, highlighted on Exhibit 3, in which multiple individuals were purportedly in the same accident, began treatment at Erdman on or about the same date, within days of the accident, were subjected to the same or nearly identical treatment, and were discharged on or about the same date. For example, patients C.C. and M.B. were purportedly in an accident on August 20, 2013. *Id.*, Patient Nos. 391-92. Both began treatment at Erdman on August 21, 2013, received the same treatment, and were discharged on the same date, September 19, 2013. *Id.* Similarly, patients D.M. and T.S. were purportedly in an accident on January 14, 2015. *Id.*, Patient Nos. 520-21. Both began treatment at Erdman the following day, received the same treatment, and were discharged on the same date, February 25, 2015, *id.*, despite reporting at least some different complaints. Such uniformity of treatment among passengers from the same accident is simply not credible and further underscores the fraudulent nature of the Clinic's scheme.

### 4. Liberty

#### a. The Chiropractors' Initial Examinations at Liberty

135. When patients at Liberty receive an initial examination from a chiropractor, the purported results are documented in written reports. *See* Exemplar Reports at Exhibit 25. From

at least April 2010 to April 2015, Defendant Bazzazieh, among others, performed initial chiropractic examinations at Liberty. From approximately April 2015 to the present, Defendant Owen and others have performed initial chiropractic examinations at Liberty.

136. Patients almost always purportedly report pain in their necks and/or backs. In addition, some patients report headaches and symptoms in other parts of the body.

137. In addition to documenting patients' purported subjective complaints, the chiropractors at Liberty purport to conduct physical examinations, including of the cervical, thoracic, and/or lumbar regions of the spine. Where the physical examinations are abnormal, the results are the same or similar across multiple patients. *See* Exhibit 13.

138. Patients are routinely found to have positive findings when orthopedic tests are performed. *See* Exhibit 13. For example, patients with abnormal cervical examinations are virtually always found to have positive cervical compression and/or shoulder depression tests. *Id.* Likewise, patients with abnormal lumbar examinations are routinely found to have positive Kemp's, Yeoman's, and/or Milgram's tests. *Id.* Regardless of which tests are performed or the results, the treatment plan and treatment modalities are the same or substantially the same for everyone, and virtually no one is referred for outside consultations or diagnostic testing. *Id.*; *see also* Exhibit 4.

139. Based on the patients' subjective complaints and results of their physical examinations, the chiropractors at Liberty purportedly diagnose virtually every patient with the same or similar conditions, namely a sprain or strain of the neck and/or back, among other diagnoses. *See* Exhibit 13.

140. Regardless of patients' individual diagnoses, the Liberty chiropractors ultimately recommend the same or substantially the same treatment plan for nearly every patient, which

does not take into account each patient's unique circumstances and is not credible. *See* Exhibit 13; *see supra* ¶¶ 63-77. Specifically, for nearly every patient, the Liberty chiropractors recommend: physiotherapy and/or physical therapy, spinal manipulation, interferential heat or e-stim, ice, and rehabilitative exercises. Exhibit 13. The chiropractors also recommend that the majority of patients receive counseling in ADLs. *Id.*

**b. The Medical Doctors' Initial Examinations at Liberty**

141. Patients at Liberty are also typically subjected to initial examinations by medical doctors, the results of which are purportedly documented in written reports. *See* Exemplar Reports at Exhibit 26. Defendants Enoch and Mukamal are the main medical doctors who perform initial examinations at Liberty. Regardless of which doctor performs the initial examination, the patterns in the documentation and subsequent treatment are virtually the same.

142. For instance, most patients purportedly complain of pain in the neck and/or back, with many also purportedly complaining of headaches or symptoms in other parts of the body.

143. The medical doctors at Liberty purport to conduct physical examinations, including physical examinations of the neck, mid back, and/or lower back. The results of these examinations are the same or similar across numerous patients. *See* Exhibit 14. Once again, virtually every patient who was subjected to an SLR was reported to have negative results, both improbable and problematic for the reasons discussed at ¶¶ 94-96, *supra*. *See* Exhibit 14.

144. Notably, however, the chiropractors at Liberty make contradictory findings during their initial examinations. The chiropractors routinely found positive results when certain orthopedic tests were administered, including the SLR—the same test employed by the medical doctors, which resulted in negative findings in virtually every patient tested. *Compare, e.g.*, Exhibit 13 Patient Nos. 155, 261 and 352, *with* Exhibit 14 Patient Nos. 220, 353 and 486, respectively. These contradictory findings were reported even though the chiropractors' and

doctors' initial examinations typically occurred at the beginning of each patients' treatment, within days of each other. *Id.* Moreover, the inconsistent results are not addressed in either set of reports.

145. Additionally, out of the approximately 789 patients who were treated at Liberty, all but 19 of them began their treatment within 21 days following their reported automobile accident. *See* Exhibit 4. Notably, the doctors at Liberty noted the absence of swelling and/or ecchymoses in the spinal regions in virtually every patient until approximately June 2016 when they began using a different initial examination template that no longer documents swelling and/or ecchymoses, or the absence thereof, for any patient. *See* Exhibit 14. Again, these findings are implausible for the reasons discussed herein at ¶ 92.

146. At the conclusion of their initial examinations, the medical doctors at Liberty diagnose virtually every patient with a sprain or strain of one more regions of the spine. *See* Exhibit 14. In addition, while the doctors at Liberty diagnose the majority of patients with some other conditions like post-traumatic headaches or traumatic injuries to the knees and shoulders, treatment plans are not varied or individualized to address these injuries. *Id.* Nor are patients referred for consultations with specialists (such as neurologists or orthopedists) or for diagnostic testing to address these conditions.

147. Instead, like the patients at the other Clinics, patients at Liberty receive virtually identical treatment plans from the medical doctors, regardless of their unique circumstances. *See* Exhibit 14. Specifically, Enoch and Mukamal recommend that virtually every patient receives medication and chiropractic care, performs exercises, and receives a heating pad. *Id.* However, the reports fail to document the specific exercises that are purportedly appropriate for each patient. *See* Exhibit 26. In addition, when prescribed, medications, orthotics, and DME are

dispensed at Liberty and billed through Mid-Atlantic Medical Supply & Equipment. *See* Exhibit 14.

148. Because the treatment plan and the treatment modalities patients receive are predetermined and the same or substantially the same for every patient, nothing that occurs at the initial examinations have any bearing on the patients' treatment, and accordingly, the initial examinations are not legitimate or medically necessary.

**c. The Predetermined Treatment Protocol at Liberty**

149. Following their initial examinations, patients at Liberty are subjected to a Predetermined Treatment Protocol consisting of the same or substantially the same combination of four or more modalities for virtually every patient on virtually every date of service. Specifically, the Predetermined Treatment Protocol at Liberty consists of: hot packs, e-stim, chiropractic manipulations, mechanical traction, and occasionally, manual therapy, or a combination of four or more of these modalities on each visit. *See* Exhibit 4. Once again, the modalities are not individualized or adjusted over the course of treatment to address patients' unique response or progress (or lack thereof). Further, the passive modalities described above are utilized on virtually every visit throughout the entire course of care and are not phased out over time as one would expect if legitimate treatment were being rendered. Moreover, less than half of the patients who were treated at Liberty received any active therapy such as therapeutic exercise. *Id.* To the extent patients receive active therapy, the documentation is deficient. Specifically, to the extent the documentation is legible at all, the provider notes the exercise and the amount of time it is performed, but fails to document any clinical reasoning such as why a particular exercise was performed or how the patient responded.

150. Patients are subjected to the Predetermined Treatment Protocol not because the treatment is medically necessary, but because, by subjecting virtually every patient to four or

more modalities on virtually every date of service, Liberty is able to submit multiple charges for each date of service, which, in turn, enables Liberty to run through patients' No-Fault Benefits relatively quickly, generate sufficient charges to support BI Claims of no more than $15,000, and discharge the patients to make room for new patients who can be subjected to the Predetermined Treatment Protocol. In total, SFM and SFF have identified 789 of their insureds who were treated at Liberty between April 2010 and the present. Of those, on average, patients received four or more modalities on virtually every visit. Only 28 Liberty patients had more than 15 treatment dates, only three had more than 20 treatment dates, and only four patients' total bills exceeded $6,000.

151. Finally, SFM and SFF have identified numerous claims, highlighted on Exhibit 4, in which multiple individuals were purportedly in the same accident, began treatment at Liberty on or about the same date, within days of the accident, were subjected to the same or virtually the same treatment, and were discharged on or about the same date. For example, patients B.F. and M.T. were purportedly in an accident on February 9, 2011. *Id.*, Patient Nos. 66-67. Both began treatment at Liberty on February 11, 2011, received the same treatment, and were discharged on the same date, March 18, 2011. *Id.* Similarly, patients B.H. and M.L. were purportedly in an accident on November 10, 2012. *Id.*, Patient Nos. 282-83. Both began treatment at Liberty on November 13, 2012, received the same treatment, and were discharged on the same date, December 21, 2012. *Id.* Such uniformity of treatment among passengers from the same accident is simply not credible and further underscores the fraudulent nature of the Clinic's scheme.

### 5. Eastside

#### a. The Chiropractors' Initial Examinations at Eastside

152. When patients at Eastside receive an initial examination from a chiropractor, the purported results are documented in written reports. *See* Exemplar Reports at Exhibit 27. From

at least April 2010 to February 2011, Morgan McIlree, DC was the main chiropractor performing initial examinations at Eastside. From May 2011 to the present, Defendant Butler has been the main chiropractor conducting initial examinations at Eastside.

153. The Eastside chiropractors' written reports typically document patients as purportedly reporting pain in their necks and/or backs, with many also purportedly reporting that they are in "physical distress" and suffering from headaches.

154. In addition to documenting patients' purported subjective complaints, the chiropractors at Eastside also purport to conduct physical examinations, including of the cervical, thoracic, and/or lumbar regions of the spine. The results of these physical examinations are frequently purportedly the same or similar across multiple patients, namely tenderness or hypertonicity in one or more spinal regions. *See* Exhibit 15.

155. The Eastside chiropractors also routinely incorporate certain orthopedic tests into their spinal examinations, and report that such tests elicited pain for virtually every patient. *See* Exhibit 15. These tests include cervical compression, shoulder depression, Soto Hall, cervical distraction, O'Donoghue's, Kemp's, Milgram's, Ely's, and/or Bechterew's tests. *Id.* Regardless of which tests the Eastside chiropractors perform, patients receive the same or substantially the same treatment plan and combination of treatment modalities. *Id.*; *see also* Exhibit 5.

156. Based on the patients' subjective complaints and results of their physical examinations, the chiropractors at Eastside purport to diagnose virtually every patient with a sprain or strain of the neck and/or back, among other diagnoses, and recommend the same or substantially the same treatment plan for nearly every patient. *See* Exhibit 15.

157. Specifically, the treatment plan consists of the following recommendations for nearly every patient: rehabilitative exercise, spinal manipulation, interferential heat or e-stim,

ice, "massage/trigger point therapy," moist heat, cryotherapy, physiotherapy and/or physical therapy, as well as traction for most patients. *Id.* As discussed above, it is incredible that virtually every patient requires the same treatment plan. *See supra* ¶¶ 63-77.

**b. The Medical Doctors' Initial Examinations at Eastside**

158. When patients at Eastside are subjected to initial examinations conducted by medical doctors, the results are purportedly documented in written reports. *See* Exemplar Reports at Exhibit 28. From approximately July 2010 to January 2012, Walter Kozachuk, MD was the main medical doctor who performed initial examinations at Eastside. From approximately April 2012 to the present, Defendant Bey has been the main medical doctor performing initial examinations at Eastside. Regardless of which doctor performs the initial examination, there are patterns in the documentation and subsequent treatment that are—implausibly—virtually the same.

159. Specifically, most patients purportedly complain of pain in the neck and/or back, with a large number of patients also purportedly complaining of headaches and symptoms in other parts of the body.

160. The medical doctors at Eastside also purport to conduct physical examinations, including examinations of the neck, mid back, and/or lower back. The results of these examinations are often the same or similar across numerous patients. *See* Exhibit 16. Specifically, patients with abnormal examinations are typically reported to exhibit spasms or tenderness and restricted ROM in one or more regions of the spine. *Id.*

161. In addition, the majority of patients are subjected to SLR, with the same, negative results reported for virtually every patient tested, which allows the doctors to document the absence of symptoms or findings that might support referrals for outside consultations or diagnostic testing. *See* Exhibit 16.

162. The doctors purport to reach diagnoses at the conclusion of their initial examinations, with virtually every patient being diagnosed with a sprain or strain of one or more regions of the spine. *See* Exhibit 16. The Eastside doctors also routinely diagnose patients with "decreased energy, insomnia, and fatigue," as well as post-traumatic headaches and traumatic injuries of other parts of the body, although the treatment plan and the treatment modalities do not vary to address these conditions. *Id.* Nor are patients referred for consultations to specialists such as neurologists or orthopedists, or for diagnostic testing, in order to address these conditions.

163. Patients receive virtually identical "treatment plans" from the doctors, regardless of their unique circumstances. *See* Exhibit 16. Specifically, the doctors recommend that virtually every patient receives chiropractic care and performs exercises; however, the reports fail to document the specific exercises that are purportedly appropriate for each patient. *Id.*; *see also* Exhibit 28. In addition, the doctors recommend that the majority of patients receive medication and heating pads. When medication is prescribed, it is dispensed at Eastside, as are the heating pads. The medications and DME are billed through Mid-Atlantic Medical Supply & Equipment. *See* Exhibit 16.

**c. The Predetermined Treatment Protocol at Eastside**

164. Following their initial examinations, patients at Eastside are subjected to a Predetermined Treatment Protocol consisting of the same or substantially the same combination of four or more modalities for virtually every patient on virtually every date of service. *See* Exhibit 5. Specifically, the Predetermined Treatment Protocol at Eastside consists of: hot packs, e-stim, chiropractic manipulations, mechanical traction, therapeutic exercises, and manual therapy, or some combination of four or more of these modalities on each visit. *Id.* The treatment is not individualized or adjusted over the course of treatment to address patients'

unique response to treatment or progress (or lack thereof). Further, the passive modalities described above are utilized on virtually every visit and are not phased out over time as one would expect in a legitimate setting. *Id.*

165. Patients are subjected to the Predetermined Treatment Protocol not because the treatment is medically necessary, but because, by subjecting virtually every patient to multiple modalities on virtually every date of service, Eastside is able to submit multiple charges for each date of service which, in turn, enables Eastside to relatively quickly run through patients' No-Fault Benefits, generate sufficient charges to support BI Claims of no more than $15,000, and discharge the patients to make room for new patients who can be subjected to the same Predetermined Treatment Protocol. Between April 2010 and the present, SFM and SFF have identified 205 of their insureds who received treatment at Eastside. Of those, the average number of modalities each patient received on virtually every treatment date was four or more modalities. In addition, only one Eastside patient had more than 15 treatment dates, and that patient's total bills did not exceed $6,000.

166. Furthermore, SFM and SFF have identified numerous claims, highlighted in Exhibit 5, in which multiple individuals who were purportedly in the same accident began treatment at Eastside on or about the same date, within days of the accident, were subjected to the same or nearly identical treatment, and were discharged on or about the same date. For example, patients E.W. and N.B.S. were reportedly in an accident on October 23, 2010. *Id.*, Patient Nos. 32-33. Both began treatment at Eastside on October 25, 2010, received virtually identical treatment, and were discharged on the same date, November 30, 2010. *Id.* Similarly, patients D.E. and R.O.T. were reportedly in an accident on December 24, 2010. *Id.*, Patient Nos. 40-41. Both began treatment at Eastside on December 29, 2010, received virtually identical

treatment, and were discharged on the same date, February 8, 2011. *Id.* Such uniformity of treatment among passengers from the same accident is simply not credible and further underscores the fraudulent nature of the Clinic's scheme.

**6. Mondawmin**

**a. The Chiropractors' Initial Examinations at Mondawmin**

167. When patients at Mondawmin receive initial examinations from a chiropractor, the purported results are documented in written reports. *See* Exemplar Reports at Exhibit 29. From at least April 2010 to the present, Defendant Kampmann has been the main chiropractor performing initial examinations at Mondawmin, though Defendant Butler, among others, has also performed initial chiropractic examinations at Mondawmin.

168. The Mondawmin chiropractors' written reports almost always document patients as purportedly reporting pain in their necks and/or backs, with many patients also purportedly reporting headaches and symptoms in other parts of the body. In addition, when reported, the Mondawmin chiropractors document that the majority of patients denied referral of pain to the extremities. *See* Exhibit 17. This is noteworthy because, as discussed above, symptoms suggestive of a radiculopathy or other nerve pathology might warrant a referral for an outside consultation or diagnostic testing. By documenting the absence of such symptoms, the chiropractors are able to avoid making such referrals and avoid steering patients' No-Fault Benefits to other providers.

169. The chiropractors at Mondawmin also purport to conduct physical examinations, including examinations of the cervical and/or lumbar regions of the spine. The results of these physical examinations are frequently the same or similar across multiple patients. *See* Exhibit 17.

170. Specifically, virtually every patient with an abnormal cervical and/or lumbar examination was found to exhibit restricted ROM. *See* Exhibit 17. In addition, virtually every patient with an abnormal cervical examination was reported to have a positive cervical compression and/or shoulder depression test. *Id.* Similarly, virtually every patient with an abnormal lumbar examination was reported to have a positive Kemp's test. *Id.* Patients, however, receive the same treatment plan and treatment regardless of which tests are performed or the results of those tests. *Id.*; *see also* Exhibit 6.

171. Purportedly based on the patients' subjective complaints and results of their physical examinations, the chiropractors at Mondawmin purport to diagnose virtually every patient with the same or similar conditions, namely a sprain or strain of the neck or back, among other diagnoses, and recommend a virtually identical treatment plan for nearly every patient. *See* Exhibit 17.

172. The Mondawmin chiropractors' treatment plan consists of: physiotherapy and/or physical therapy, spinal manipulation, interferential heat, ice, rehabilitative exercises, cryotherapy, moist heat, and counseling in ADLs. *Id.* As discussed above, it is incredible that virtually every patient requires the same treatment plan. *See supra* ¶¶ 63-77.

**b. The Medical Doctors' Initial Examinations at Mondawmin**

173. When patients at Mondawmin are subjected to initial examinations conducted by medical doctors, the results are purportedly documented in written reports. *See* Exemplar Reports at Exhibit 30. From approximately July 2010 to January 2012, Walter Kozachuk, MD ("Kozachuk") was the main medical doctor performing initial examinations at Mondawmin. From approximately April 2012 to the present, Defendant Bey has been the main medical doctor performing initial examinations at Mondawmin. Regardless of the doctor, for most patients, the non-credible patterns in the documentation and subsequent treatment are virtually the same.

174. Specifically, most patients purportedly complain of pain in the neck and/or back, with a large number of patients also purportedly complaining of headaches and symptoms in other parts of the body. In addition, Kozachuk regularly reported that patients suffered from fatigue, insomnia, and decreased endurance.

175. The doctors at Mondawmin purport to conduct physical examinations, including examinations of the cervical and/or lumbar regions of the spine. The results of these examinations are often the same or similar across numerous patients. *See* Exhibit 18.

176. Patients with abnormal spinal examinations are reported to have spasm or tenderness and restricted ROM in the affected spinal region. *See* Exhibit 18. Virtually every patient who was subjected to an SLR was reported to have the same, negative result, and Kozachuk reported a negative Lhermitte's Sign, a test used to provoke radiating pain in the cervical spine, in virtually every patient he examined. *Id.* In addition, the majority of patients were reported to have no pain in the SN and/or SI joint(s). *Id.* As discussed above, by documenting negative results from tests used to provoke radicular pain, the doctors are documenting the absence of symptoms that might warrant referrals for outside consultations and diagnostic testing, which could reduce the amount of No-Fault Benefits available to Mondawmin.

177. The medical doctors purport to reach diagnoses at the conclusion of their initial examinations, with virtually every patient being diagnosed with a sprain or strain of one or more regions of the spine. *See* Exhibit 18. The doctors also diagnose a large number of patients with post-traumatic headaches or other diagnoses. In addition, the doctors diagnose some patients with decreased energy, insomnia and fatigue. Regardless of patients' specific diagnoses, the

doctors prescribe the same or substantially the same treatment plan for virtually every patient. *Id.*

178. Specifically, virtually every patient is recommended to receive chiropractic care and/or physical therapy and perform exercises; however, the reports fail to document the specific exercises that are purportedly appropriate for each patient. *Id.* In addition, the majority of patients are recommended to receive medication, and Kozachuk recommended a heating pad for virtually every patient he saw, which was billed through Mid-Atlantic Medical Supply & Equipment, as were any prescription medications that were dispensed at Mondawmin. *Id.*

**i Kozachuk's Deposition Testimony**

179. On December 10, 2012, Kozachuk was deposed in the matter of *Robinson v. State Farm,* Circuit Court of Baltimore City, Maryland Case No. 24-C-12-003732 MT. *See* Exhibit 31. Kozachuk testified that his specialty is neurology. *Id.* at 15-16. He testified he began working for Slade in the summer of 2010 and left in January 2012 because he did not like the general quality of care being provided to the patients. *Id.* at 49-50. In particular, he testified he "wanted to order more complex studies, MRIs, EMG," but "Slade" thought it was too costly. *Id.* at 60-64. When asked whether it caused him concern that he was told he could not order medical tests that he believed were necessary, Kozachuk answered "yes," and explained that the refusal to order such tests "wasn't in the best interests of the patients." *Id.* at 66-67. He further testified he recalled "talking to the owner [of Slade] a few times," as well as to the office managers about the fact that he had ordered tests and later found out they were not done. He indicated that he was told by either the manager, or he "may have been told by Mr. Barg . . . that we could not order certain tests for patients." *Id.* at 66-68, 113-14. He further testified that when he "ran into that road block, [he] left." *Id.* at 66-68. Kozachuk also testified that "a lot of times [he] felt that

the patient needed more therapy [when] they were discharged," which was "disconcerting." *Id.* at 128.

**c. The Predetermined Treatment Protocol at Mondawmin**

180. Following their initial examinations, patients at Mondawmin are subjected to a Predetermined Treatment Protocol consisting of the same or substantially the same combination of four or more modalities for virtually every patient on virtually every date of service. *See* Exhibit 6. Specifically, the Predetermined Treatment Protocol at Mondawmin consists of: hot packs, e-stim, chiropractic manipulations, mechanical traction, and therapeutic exercise, or a combination of four or more of these modalities on each visit. *Id.* The treatment at Mondawmin is not individualized or adjusted over the course of treatment to address patients' unique response to treatment or progress (or lack thereof). Further, the passive modalities identified above are utilized throughout the entire course of care and are not phased out over time as one would expect in a legitimate setting.

181. Patients are subjected to the Predetermined Treatment Protocol not because the treatment is medically necessary, but because, by subjecting virtually every patient to multiple modalities on virtually every date of service, Mondawmin is able to submit multiple charges for each date of service which, in turn, enables Mondawmin to relatively quickly run through patients' No-Fault Benefits, generate sufficient charges to support BI Claims of no more than $15,000, and discharge the patients to make room for new patients who can be subjected to the same Predetermined Treatment Protocol. In sum, SFM and SFF have identified 1,002 of their insureds who were treated at Mondawmin between April 2010 and the present. Of those, each patient received, on average, four or more modalities on virtually every treatment date. Only four Mondawmin patients had more than 15 treatment dates, only one patient had 20 treatment dates, and only one patient's total bill exceeded $6,000.

182. Furthermore, SFM and SFF have identified numerous claims, highlighted on Exhibit 6, in which multiple individuals were purportedly in the same accident, began treatment at Mondawmin on or about the same date, within days of the accident, were subjected to the same or nearly identical treatment, and were discharged on or about the same date. For example, patients D.J., E.W., E.S., and M.W. were purportedly in an accident on October 28, 2010. *Id.*, Patient Nos. 40-43. All four began treatment at Mondawmin on November 1, 2010, received the same treatment, and were discharged on the same date, November 30, 2010, *id.*, despite reporting at least some different complaints. Similarly, patients C.T. and D.F. were purportedly in an accident on October 28, 2013. *Id.*, Patient Nos. 505-06. Both began treatment at Mondawmin the following date, October 29, 2013, received the same treatment, and were discharged on the same date, November 20, 2013, *id.*, despite reporting at least some different complaints. Such uniformity of treatment among passengers from the same accident is simply not credible and further underscores the fraudulent nature of the Clinic's scheme.

**D. Progress Notes, Re-Evaluations, and Discharges at the Clinics**

183. As noted above, examinations, diagnoses, and treatment must be appropriately documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patient; and (d) payors such as SFM and SFF so that they can pay for necessary treatment. *See also supra* ¶ 76.

184. The Clinics purport to document the treatment they provide in Progress and Procedure Notes ("Progress Notes"). The majority of the Progress Notes are handwritten, half-page templates in which information and descriptions are circled on each date of service, with little additional information provided, and are often illegible. Beginning in 2016, Mount Clare

and Liberty began using typewritten Progress Note templates that reflect the same type of generic information as the handwritten Progress Notes.

185. The Clinics each use the same general format for the handwritten Progress Notes. Each Progress Note contains the patient's name, the date of service, the chiropractor's signature, the patient's initials, and sometimes, the date of the accident. The Progress Note also lists body parts (e.g., neck, mid back, low back) and complaints (e.g., headaches, insomnia), which can be circled, with space where additional information can be documented. This is followed by a "subjective" section, which calls for the provider to circle "same/better/worse/changed," with a space to make additional notes, and an "objective" section, which calls for the provider to circle choices such as mild, moderate, severe, dull, sharp, spasm, tenderness, no change, and none. The Progress Note also includes an "assessments" section, which calls for the provider to circle from choices including no change, slow, steady, worse, improving, exacerbated, new, resolved, referred, or released. There is space to make additional notes after both the "objective" and "assessments" sections, and some templates include abbreviations for certain muscles and spinal levels in the "objective" section, which can also be circled to identify the particular area of the patient's body being described. There is also a "treatment" section that provides a list of CPT codes and the names of each modality, with space to identify the area of the body treated, the amount of time the modality was applied, or other information.

186. Little to no evidence of clinical reasoning is present in the Progress Notes, nor do they indicate how the patient responded to any particular modality or the rationale for repeating the same or virtually the same combination of four or more modalities on virtually every visit from the beginning to the end of treatment.

187. In addition, as noted above, patients should be periodically re-evaluated to determine how they are progressing in therapy and necessary adjustments made or other treatment options considered.

188. Patients of the Clinics, however, are rarely, if ever, re-evaluated. Instead, most patients treat for an average of 11 dates of service and are then discharged. Indeed, out of more than 4,000 patients, SFM and SFF only received reports indicating re-evaluations were performed for approximately 4% of Alameda patients, 12% of Eastside patients, 9% of Mondawmin patients, 5% of Erdman patients, 5% of Mount Clare patients, and 2% of Liberty patients. Even for this limited number of patients, the re-evaluations served no legitimate purpose because, after the re-evaluations, these patients continued to receive the same predetermined course of care they received before the re-evaluation.

189. Although many patients stop treating on their own, for those patients who complete treatment, as noted, the duration of treatment is similar for everyone and is followed by an abrupt discharge in most cases. Final examinations and discharges are typically documented in written reports.

190. A significant number of patients are discharged with a finding that they have reached MMI, even though the final reports for those patients indicate that they still suffer from residual pain. Exhibits 1-6. This illustrates that the discharge did not occur because patients had achieved MMI, but occurred because their predetermined course of treatment had achieved the Defendants' predetermined goals, and by discharging the patients, the Defendants could free up their resources to repeat the Predetermined Treatment Protocol for new patients.

### E. Staged Accident Participants Were Also Subjected To The Predetermined Treatment Protocol

191. As further evidence of the Defendants' Predetermined Treatment Protocol, SFM and SFF have identified several instances in which the Clinics have submitted bills and supporting documentation for treatment provided to patients who do not appear to have been in an actual accident but participated in staged accidents and made false claims as if they had been in actual accidents. These patients, who could not have been injured because they were not in actual accidents, received the same Predetermined Treatment Protocol as the other patients at the Clinics.

#### 1. The November 13, 2011 Staged Accident

192. On November 13, 2011, five individuals were allegedly involved in an automobile accident in Baltimore, Maryland. The alleged at-fault driver, T.R., was covered by a SFF No-Fault automobile insurance policy. There were allegedly three additional passengers riding in T.R.'s car at the time of the reported accident ("Car 1"). The day after the accident, three of the four individuals in Car 1 sought treatment at the Mondawmin clinic, while one individual sought treatment at Mondawmin the *same* day as the accident.

193. The driver of Car 2, D.W., gave a deposition in connection with a BI claim during which she admitted that this accident was not a real accident at all, but was a "set up," or a staged loss. *See* D.W. Tr. at 117, Exhibit 32. The owner of Car 2, T.S., was involved with a man known as "Sadiq." *Id.* at 29. D.W. was recruited by Sadiq with the promise that she would be paid $500 for each staged accident in which she participated. *Id.* at 30. Further, Sadiq would recruit other individuals to participate in each staged accident, and there would always be at least three people in the other vehicle. *Id.* at 31. D.W.'s job was to pick up the 1998 Chrysler Concorde (Car 2 in the November 13, 2011 staged accident which belonged to Sadiq's girlfriend,

T.S.), and meet Sadiq at a gas station where together they would wait for the other participants to arrive, including Car 2, which would be used in the accident. *Id.* at 31, 41-42. Before the November 13, 2011 staged accident, Sadiq drove both cars (T.S.'s 1998 Chrysler Concorde and the other car) into a wall behind the gas station to damage the cars. *Id.* at 42-43. Although T.S.'s 1998 Chrysler Concorde was used to make claims in subsequent staged accidents, Sadiq did not need to damage it again. He did, however, damage the other cars used in each staged accident by driving them into the wall behind the same gas station, including some rental cars that were used in some of the staged accidents and rented by D.W. for that purpose. *Id.* at 42-43, 65-68.

194. After the cars were damaged behind the gas station, all of the participants and Sadiq would go to an area in East Baltimore, and Sadiq would instruct them on how to position the cars. *Id.* at 43-44, 106-07, 111. Specifically, Sadiq would tell D.W. to try to get the damaged part of the car she was driving as close as possible to the damaged part of the other car. *Id.* at 111. They would also discuss "who was going to say what," and then Sadiq would leave the scene and the police would be called to report the "accident." *Id.* at 43-44, 106-07, 111.

195. According to D.W., the accidents were always staged on different streets in East Baltimore, which Sadiq would choose. *Id.* at 109. Sadiq "had everything set up, the lawyers, the physical therapists, and everything." *Id.* at 41. Further, D.W. believed the "physical therapist" knew the accidents were staged. *Id.* at 48. Sadiq paid D.W. $500 for each staged accident in which she participated. *Id.* at 49-50. In total, D.W. admitted she participated in "about six" staged accidents. *Id.* at 52-53.

196. The driver, T.R., and all three passengers in Car 1 were subjected to the Predetermined Treatment Protocol at Mondawmin, beginning treatment either the same day (passenger D.L.) or the day after the "accident."

197. All four of the patients were diagnosed by the chiropractor at Mondawmin, Defendant Kampmann, with sprains and strains in two or more regions of the spine and were recommended the same treatment plan.

198. Each patient then received virtually identical treatment on virtually every date of service. Each patient was then discharged after 14-16 dates of service with a finding that each had reached MMI. Although each was found to be at MMI, patient D.L. reported residual pain in his cervical spine and was given a prescription for thirty doses of a muscle relaxer on his final date of service. None of these patients was referred to any other provider for any other service.

199. Additionally, each of the patients received the same prescriptions, orthotics, and DME, dispensed by the receptionist at Mondawmin. Passenger D.L. testified that his prescribed medications were dispensed at the clinic even though he worked at a Rite Aid. *See* D.L. Tr. at 86-88, Exhibit 33.

**2. The November 27, 2011 Staged Accident**

200. D.W., the driver of Car 2 in the November 13, 2011 staged accident, was involved in another staged accident just two weeks later, on November 27, 2011. Once again, D.W. was allegedly driving the 1998 Chrysler Concorde that belonged to Sadiq's girlfriend, T.S. ("Car 1"). In addition, once again, the second car ("Car 2") was packed with multiple passengers who subsequently sought medical treatment from a Slade Clinic, this time Liberty.

201. As discussed above, D.W. testified the accident was staged, and she was recruited by Sadiq to participate in numerous staged accidents for which she was paid $500 per accident. *See* Exhibit 32 at 30-31, 41-44, 49-50, 106-07, 109, 111, 117.

202. Ultimately, after this "accident," the driver and three of the four passengers in Car 2 were treated at Liberty where they were subjected to the Predetermined Treatment Protocol.

203. According to the testimony of M.T., the driver of Car 2, she was sent to Liberty by her lawyer who made the first appointment for her. *See* M.T. Tr. at 42, Exhibit 34. All four individuals began treatment on the exact same day, November 28, 2011, one day after the accident. All four were also discharged on the same day, January 4, 2012.

204. All four were diagnosed by the Liberty medical doctor, Defendant Mukamal, with sprains and strains in two or more regions of the spine and were recommended the same or substantially the same treatment plan. Each patient then received treatment consisting of e-stim, hot and cold packs, spinal manipulation, mechanical traction, and myofascial release. Additionally, each of the participants in the alleged accident received the same prescriptions, orthotics, and DME dispensed by the receptionist at Liberty.

205. Each patient in Car 2 was ultimately discharged with a finding that each had reached MMI. Although each was found to be at MMI, M.L. and A.H. still purportedly complained of residual symptoms and pain at the time of discharge. None of these patients was referred to any other provider for any other service.

**3. The January 28, 2013 Staged Accident**

206. In other instances, individuals who do not appear connected to "Sadiq" participated in staged accidents and received the Predetermined Treatment Protocol at one of the Clinics. For example, on January 28, 2013, an accident allegedly occurred between a 2003 Dodge Ram driven by a SFM insured and a 2007 Nissan Altima, the claimant vehicle. Five passengers claimed to be in the Altima at the time of the alleged accident. All five were subsequently treated at a Slade clinic: three at Erdman, one at Alameda, and one at Mondawmin.

207. Because SFM's claim investigation revealed facts suggesting the accident might not have occurred as reported, if at all, SFM filed a declaratory judgment action in the Circuit Court for Baltimore City, Maryland, Civil Division seeking a declaration that coverage for this claim was precluded because it was a staged event. The defendants failed to appear and defend against the action, default judgments were entered, and the action was ultimately dismissed.

208. As part of the declaratory judgment litigation, SFM deposed several participants, including D.D. and D.T., a mother and son who had claimed to be passengers in the Altima. D.D. admitted that the accident was staged. *See* D.D. Tr. at 71-72, 75-79, Exhibit 35. She was instructed to come to the accident scene in exchange for the promise that she would be paid for saying she was hurt in the accident. *Id.* at 71-72, 75-79. When she arrived at the accident scene, the cars were already in place. *Id.* at 78. D.D. knew one of the passengers who was allegedly in the ***other car***, H.H., because she worked with him. She admitted H.H. was not really in the other car. *Id.* at 66-68, 79-81. When D.D. got to the scene, a "guy" by the name of "Black" told her what to tell the police when they arrived. *Id.* at 75, 81-87. The plan called for D.D. to pay some money to "Black" after she collected it from the insurance company. *Id.* at 87-88.

209. D.D. also admitted she brought her son, D.T., to the accident scene that night to claim that he also was in the Altima at the time of the accident. *Id.* at 92. D.T. was also deposed. *See* Exhibit 36. Although he initially claimed he was in a legitimate accident, he ultimately admitted he had been driven to the scene by his mother and then "[e]verything happened." *Id.* at 21-22. The cars were already damaged when they arrived at the scene. *Id.* at 23-24. D.T. agreed to participate in the staged accident based on the understanding that he would be paid. *Id.* at 25-26.

210. Following the accident, both D.D. and D.T. saw a lawyer who "Stephanie," one of the accident organizers, told them to see. *See* Exhibit 35 at 75. D.T. testified that the lawyer told them which doctor to see. Exhibit 36 at 24.

211. D.D., D.T., and one additional passenger, R.B., were treated at Erdman. The driver, S.A., was treated at Alameda, and the fourth passenger, D.S., was treated at Mondawmin. All of the accident participants sought treatment within days following the accident, and each individual was discharged on the same date with a finding of MMI.

212. D.T. and R.B. were diagnosed by the Erdman medical doctor, Defendant Mukamal, with a sprain and strain of the back, among other diagnoses, while D.D. was diagnosed with a right shoulder injury. Defendant Mukamal recommended that each undergo the same treatment. Each patient then received hot/cold packs, mechanical traction, e-stim, chiropractic manipulation, and rehabilitative exercises on virtually every date of service. All three patients were then discharged on March 7, 2013 with a finding that each had reached MMI, although each individual also purportedly reported residual pain at discharge.

213. S.A. underwent an initial examination at Alameda three days after the purported accident. S.A. was diagnosed with a sprain and strain of the back, among other diagnoses, received the Predetermined Treatment Protocol, and was discharged on March 22, 2013 after 12 dates of service with a finding she had reached MMI.

214. D.S. underwent an initial examination at Mondawmin two days after the purported accident. D.S. was diagnosed by the Mondawmin chiropractor, Defendant Kampmann, with sprains and strains in the neck and back, among other diagnoses, and was subjected to the same Predetermined Treatment Protocol at Mondawmin on virtually every date of service consisting of hot/cold packs, mechanical traction, e-stim, chiropractic manipulation,

and rehabilitative exercises. D.S. was discharged on March 7, 2013 after 12 dates of service with a finding that he had reached MMI (while purportedly reporting he was still experiencing residual pain at the time of discharge).

**4. The July 10, 2015 Staged Accident**

215. On July 10, 2015, three passengers plus a driver were purportedly involved in a hit and run automobile accident. Following the accident, all four individuals were treated at Mondawmin.

216. In considering the resulting insurance claims, SFF learned certain facts suggesting the accident may not have occurred as reported, if at all. For example, SFF learned that the insured vehicle was purchased and insured just two days before the accident for $600. Following the purported accident, the vehicle was determined to be a total loss, resulting in a payment of over $2,000 to SFF's insured, more than three times the purchase price.

217. SFF retained a private investigator, Dangerfield Investigations, Inc., to assist with its inquiry. On September 11, 2015, a Dangerfield investigator interviewed Officer Brian Rose, the Baltimore City police officer who prepared the Motor Vehicle Crash Report following the purported accident. Officer Rose stated that while he was at the accident scene, several people approached him and told him the accident had been "planned" and the people in the insured vehicle were engaged in this conduct "all over Baltimore City." *See* 9/11/15 Report, Exhibit 37. Officer Rose stated that, when he asked these individuals for their contact information, they refused to provide it and left the scene. *Id.* Accordingly, he had no choice but to complete the report based on the accounts of the driver and passengers. *Id.* According to these individuals, their car was struck on the side by a Dodge Caravan, and the person or persons in the Caravan fled on foot. *Id.* When Officer Rose ran the license plate on the Caravan, he learned that it was a stolen vehicle. *Id.*

218. Officer Rose further reported that the driver and all four passengers remained seated in the insured vehicle until another car came for them, at which point, they all "jumped out" of the insured vehicle, "piled into" the other car, and left the scene. *Id.* Officer Rose noted it is unusual for people who have been in an automobile accident to remain seated in the car. *Id.*

219. Lastly, Officer Rose reported that, although all four of the individuals complained of injuries, none of them identified any specific injuries. *Id.* Further, although an ambulance was called to the accident scene, they all refused to go to a hospital for treatment. *Id.*

220. The No-Fault claims made by the driver and three passengers were denied by SFF, and all four individuals subsequently filed a lawsuit in the District Court of Maryland in which each sought no more than $15,000 in damages as a result of SFF's claim denial. *See* Exhibit 38. This lawsuit was subsequently dismissed by the court as a result of the plaintiffs' failure to participate in the lawsuit. *See* Exhibit 39.

221. The ***same day*** as the accident, the driver, S.M., and all three passengers, B.F., K.F., and A.H., began treating at Mondawmin where each was subjected to Mondawmin's Predetermined Treatment Protocol. All four received treatment consisting of hot packs, e-stim, chiropractic manipulations, traction, and therapeutic exercises on virtually every date of service. S.M., K.F., and A.H. were discharged at MMI, although their final examination reports indicated each was purportedly still experiencing residual pain at discharge. The documentation does not indicate that B.F. was formally discharged. None of these patients were referred to any other provider for any other service.

### 5. The March 24, 2016 Staged Accident

222. On March 24, 2016, three passengers plus a driver were purportedly involved in a hit and run automobile accident with an unknown vehicle. Following the accident, all four individuals were treated at a Clinic.

223. In the course of handling the resulting insurance claims, SFF learned facts that suggested the accident may not have occurred as reported, if at all. For example, the car purportedly struck by the unknown hit and run vehicle was covered by a new SFF policy of insurance written on February 19, 2016, approximately one month before the purported accident. Further, the car had been "sold" to the driver by his girlfriend (whose mother was also one of the passengers in the purported accident).

224. Following the accident, the driver, Q.B., was treated at Liberty, one passenger, J.W., was treated at Mondawmin, and the two remaining passengers, D.H. and N.H., were treated at Mount Clare. Each of them was subjected to the Clinics' Predetermined Treatment Protocol.

225. One day after the purported accident, Q.B. was diagnosed by the Liberty chiropractor Defendant Owen with sprains and strains in the neck and back, among other diagnoses, and recommended to undergo physiotherapy, rehabilitative exercise, chiropractic manipulations, e-stim, ice, and counseling in ADLs. The medical doctor, Defendant Enoch, recommended medication, chiropractic care, exercise, and dispensed a heating pad. Q.B. was then subjected to the Predetermined Treatment Protocol and discharged on May 25, 2016 after 11 treatment dates. He was not referred to any other provider for any other service.

226. Four days after the accident, the Mondawmin chiropractor, Defendant Kampmann, diagnosed J.W. with sprain and strain of the back, among other diagnoses, and recommended J.W. undergo physiotherapy, rehabilitative exercise, chiropractic manipulation, interferential therapy, moist heat, ice, cryotherapy, and counselling in ADLs. J.W. was then subjected to the Predetermined Treatment Protocol at Mondawmin and was discharged on April 25, 2016 at MMI after 10 dates of service. He was not referred to any other provider for any other service.

227. D.H. and N.H. underwent initial examinations by the Mount Clare medical doctor, Defendant Enoch, five days after the purported accident, were diagnosed with sprains and strains of the neck and back, among other diagnoses, and were recommended to receive medication, chiropractic care, and a heating pad. The chiropractor, Defendant Miller, recommended both undergo physiotherapy, rehabilitative exercise, chiropractic manipulation, interferential/e-stim, traction, and counselling in ADLs. D.H. and N.H. were then both subjected to the Predetermined Treatment Protocol at Mount Clare consisting of hot packs, e-stim, chiropractic manipulation, and traction on virtually every date of service, with D.H. also receiving manual therapy on virtually every date of service. Both D.H. and N.H. were discharged on the same date, May 3, 2016. They were not referred to any other provider for any other service.

**F. SFM's and SFF's Justifiable Reliance**

228. The Defendants are obligated legally and ethically to act honestly and with integrity. Yet, the Defendants submitted, or caused to be submitted, bills and supporting documentation that are fraudulent in that they represent that the services described on the bills and supporting documentation were submitted based on the purported medical necessity of the services when, in fact, the services were either not performed or were performed pursuant to the Predetermined Treatment Protocol, not because they were medically necessary.

229. The bills and supporting documentation the Defendants submitted, or caused to be submitted, to SFM and SFF in support of the charges at issue, combined with the material misrepresentations described above, were designed to and did cause SFM and SFF to justifiably rely on them.

230. As a result, SFM and SFF have incurred damages of more than $7.5 million.

231. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from SFM and SFF, SFM and SFF did not discover and could not

have reasonably discovered the causes of action asserted herein until sometime after the Fall of 2016, after SFM and SFF were able to begin to identify the fraudulent patterns described herein in the bills and supporting documentation across more than 4,000 patients.

## V. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD

**(Against Slade, Alameda, Barg, Podinovsky, E. Morin, Enoch, Mukamal, Hallman, Owen, Miller, and Sodano)**

232. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

233. Defendants Slade, Alameda, Barg, Podinovsky, E. Morin, Enoch, Mukamal, Hallman, Owen, Miller, and Sodano (the "Alameda Defendants") conspired, agreed, acted in concert, and assisted one another to, and did, intentionally and knowingly make false and fraudulent statements of material fact to SFM and SFF by submitting, and/or causing to be submitted, bills and supporting documentation that contained false representations of material fact concerning patients treated at Alameda.

234. The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1, 7, and 8 that: (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when the Alameda Defendants did not legitimately reach such conclusions; and (c) the treatment and services were medically necessary, when, in fact, they were not, but were provided pursuant to the Predetermined Treatment Protocol, not to address the unique needs of individual patients.

235. The Alameda Defendants knew the above-described misrepresentations made to SFM and SFF relating to the purported examinations, diagnoses, and treatment were false and fraudulent when they were made.

236. The Alameda Defendants made the above-described misrepresentations and engaged in such conduct to induce SFM and SFF into relying on the misrepresentations.

237. As a result of their justifiable reliance on the Alameda Defendants' misrepresentations, SFM and SFF have incurred damages of at least $1,200,000, including damages of at least $800,000 incurred by SFM, and damages of at least $400,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Alameda Defendants jointly and severally for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

**SECOND CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

**(Against Slade, Alameda, Barg, Podinovsky, E. Morin, Enoch, Mukamal, Hallman, Owen, Miller, and Sodano)**

238. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

239. SFM and SFF conferred a benefit upon the Alameda Defendants by paying their claims for services purportedly provided to patients treated at the Alameda clinic and these Defendants voluntarily accepted and retained the benefit of those payments.

240. Because the Alameda Defendants knowingly submitted, and/or caused to be submitted, bills for services that were not medically necessary, and because the Alameda Defendants accepted the payments for the aforementioned services, the Alameda Defendants know of and appreciate the benefit of SFM's and SFF's payments for those services, and the

circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

241. As a direct and proximate result of the above-described conduct of the Alameda Defendants, SFM and SFF have been damaged and the Alameda Defendants have been enriched by more than $1,200,000, including damages of at least $800,000 incurred by SFM, and damages of at least $400,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Alameda Defendants jointly and severally for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

**THIRD CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**

**(Against Alameda)**

242. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

243. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

244. There is an actual case or controversy between SFM and SFF, on the one hand, and Alameda, on the other hand, as to all charges for examinations, diagnoses, and treatments that have not been paid through the pendency of this litigation. SFM and SFF contend that Alameda is not entitled to reimbursement for any of these charges.

245. Because Alameda has made false claims and fraudulent statements, otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to SFM and SFF, and otherwise submitted claims that are not entitled to reimbursement, Alameda is not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE, SFM and SFF respectfully request a judgment declaring that Alameda is not entitled to collect No-Fault Benefits for any unpaid charges to date and through the pendency of this litigation, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW FRAUD**

**(Against Slade, Mount Clare, Barg, Podinovsky, E. Morin, Enoch, Mukamal, Miller, and Doyle)**

246. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

247. Defendants Slade, Mount Clare, Barg, Podinovsky, E. Morin, Enoch, Mukamal, Miller, and Doyle (the "Mount Clare Defendants") conspired, agreed, acted in concert, and assisted one another to, and did, intentionally and knowingly make false and fraudulent statements of material fact to SFM and SFF by submitting, and/or causing to be submitted, bills and supporting documentation that contained false representations of material fact concerning patients treated at Mount Clare.

248. The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 2, 9a, 9b, and 10 that: (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when the Mount Clare Defendants did not legitimately reach such conclusions; and (c) the treatment and services were medically necessary, when, in fact, they were not, but were provided pursuant to the Predetermined Treatment Protocol, not to address the unique needs of individual patients.

249. The Mount Clare Defendants knew the above-described misrepresentations made to SFM and SFF relating to the purported examinations, diagnoses, and treatment were false and fraudulent when they were made.

250. The Mount Clare Defendants made the above-described misrepresentations and engaged in such conduct to induce SFM and SFF into relying on the misrepresentations.

251. As a result of their justifiable reliance on the Mount Clare Defendants' misrepresentations, SFM and SFF have incurred damages of at least $1,200,000, including damages of at least $700,000 incurred by SFM, and damages of at least $500,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Mount Clare Defendants jointly and severally for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

**FIFTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

**(Against Slade, Mount Clare, Barg, Podinovsky, E. Morin, Enoch, Mukamal, Miller, and Doyle)**

252. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

253. SFM and SFF conferred a benefit upon the Mount Clare Defendants by paying their claims for services purportedly provided to patients treated at the Mount Clare clinic and these Defendants voluntarily accepted and retained the benefit of those payments.

254. Because the Mount Clare Defendants knowingly submitted, and/or caused to be submitted, bills for services that were not medically necessary, and because the Mount Clare Defendants accepted the payments for the aforementioned services, the Mount Clare Defendants know of and appreciate the benefit of SFM's and SFF's payments for those services, and the

circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

255. As a direct and proximate result of the above-described conduct of the Mount Clare Defendants, SFM and SFF have been damaged and the Mount Clare Defendants have been enriched by more than $1,200,000, including damages of at least $700,000 incurred by SFM, and damages of at least $500,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Mount Clare Defendants jointly and severally for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

**SIXTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**

**(Against Mount Clare)**

256. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

257. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

258. There is an actual case or controversy between SFM and SFF, on the one hand, and Mount Clare, on the other hand, as to all charges for examinations, diagnoses, and treatments that have not been paid through the pendency of this litigation. SFM and SFF contend that Mount Clare is not entitled to reimbursement for any of these charges.

259. Because Mount Clare has made false claims and fraudulent statements, otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to SFM and SFF, and otherwise submitted claims that are not entitled to reimbursement, Mount Clare is not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE, SFM and SFF respectfully request a judgment declaring that Mount Clare is not entitled to collect No-Fault Benefits for any unpaid charges to date and through the pendency of this litigation, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

**SEVENTH CLAIM FOR RELIEF**
**COMMON LAW FRAUD**

**(Against Slade, Erdman, Barg, Podinovsky, A. Morin, Enoch, Mukamal, Hallman, Miller, and Enyinnaya,)**

260. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

261. Defendants Slade, Erdman, Barg, Podinovsky, A. Morin, Enoch, Mukamal, Hallman, Miller, and Enyinnaya (the "Erdman Defendants") conspired, agreed, acted in concert, and assisted one another to, and did, intentionally and knowingly make false and fraudulent statements of material fact to SFM and SFF by submitting, and/or causing to be submitted, bills and supporting documentation that contained false representations of material fact concerning patients treated at Erdman.

262. The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 3, 11, and 12 that: (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when the Erdman Defendants did not legitimately reach such conclusions; and (c) the treatment and services were medically necessary, when, in fact, they were not, but were provided pursuant to the Predetermined Treatment Protocol and not to address the unique needs of individual patients.

263. The Erdman Defendants knew the above-described misrepresentations made to SFM and SFF relating to the purported examinations, diagnoses, and treatment were false and fraudulent when they were made.

264. The Erdman Defendants made the above-described misrepresentations and engaged in such conduct to induce SFM and SFF into relying on the misrepresentations.

265. As a result of their justifiable reliance on the Erdman Defendants' misrepresentations, SFM and SFF have incurred damages of at least $1,500,000, including damages of at least $1,000,000 incurred by SFM, and damages of at least $500,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Erdman Defendants jointly and severally for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

**EIGHTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

**(Against Slade, Erdman, Barg, Podinovsky, A. Morin, Enoch, Mukamal, Hallman, Miller, and Enyinnaya)**

266. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

267. SFM and SFF conferred a benefit upon the Erdman Defendants by paying their claims for services purportedly provided to patients treated at the Erdman clinic and these Defendants voluntarily accepted and retained the benefit of those payments.

268. Because the Erdman Defendants knowingly submitted, and/or caused to be submitted, bills for services that were not medically necessary, and because the Erdman Defendants accepted the payments for the aforementioned services, the Erdman Defendants know of and appreciate the benefit of SFM's and SFF's payments for those services, and the

circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

269. As a direct and proximate result of the above-described conduct of the Erdman Defendants, SFM and SFF have been damaged and the Erdman Defendants have been enriched by more than $1,500,000, including damages of at least $1,000,000 incurred by SFM, and damages of at least $500,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Erdman Defendants jointly and severally for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

**NINTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**

**(Against Erdman)**

270. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

271. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

272. There is an actual case or controversy between SFM and SFF, on the one hand, and Erdman, on the other hand, as to all charges for examinations, diagnoses, and treatments that have not been paid through the pendency of this litigation. SFM and SFF contend that Erdman is not entitled to reimbursement for any of these charges.

273. Because Erdman has made false claims and fraudulent statements, otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to SFM and SFF, and otherwise submitted claims that are not entitled to reimbursement, Erdman is not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE, SFM and SFF respectfully request a judgment declaring that Erdman is not entitled to collect No-Fault Benefits for any unpaid charges to date and through the pendency of this litigation, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

**TENTH CLAIM FOR RELIEF**
**COMMON LAW FRAUD**

**(Against Slade, Liberty, Podinovsky, Barg, A. Morin, Enoch, Mukamal, Bazzazieh, and Owen)**

274. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

275. Defendants Slade, Liberty, Podinovsky, Barg, A. Morin, Enoch, Mukamal, Bazzazieh, and Owen (the "Liberty Defendants") conspired, agreed, acted in concert, and assisted one another to, and did, intentionally and knowingly make false and fraudulent statements of material fact to SFM and SFF by submitting, and/or causing to be submitted, bills and supporting documentation that contained false representations of material fact concerning patients treated at Liberty.

276. The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 4, 13, and 14 that: (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when the Liberty Defendants did not legitimately reach such conclusions; and (c) the treatment and services were medically necessary, when, in fact, they were not, but were provided pursuant to the Predetermined Treatment Protocol, not to address the unique needs of individual patients.

277. The Liberty Defendants knew the above-described misrepresentations made to SFM and SFF relating to the purported examinations, diagnoses, and treatment were false and fraudulent when they were made.

278. The Liberty Defendants made the above-described misrepresentations and engaged in such conduct to induce SFM and SFF into relying on the misrepresentations.

279. As a result of their justifiable reliance on the Liberty Defendants' misrepresentations, SFM and SFF have incurred damages of at least $1,500,000, including damages of at least $1,200,000 incurred by SFM, and damages of at least $300,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Liberty Defendants jointly and severally for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

**ELEVENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

**(Against Slade, Liberty, Podinovsky, Barg, A. Morin, Enoch, Mukamal, Bazzazieh, and Owen)**

280. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

281. SFM and SFF conferred a benefit upon the Liberty Defendants by paying their claims for services purportedly provided to patients treated at the Liberty clinic and these Defendants voluntarily accepted and retained the benefit of those payments.

282. Because the Liberty Defendants knowingly submitted, and/or caused to be submitted, bills for services that were not medically necessary, and because the Liberty Defendants accepted the payments for the aforementioned services, the Liberty Defendants know of and appreciate the benefit of SFM's and SFF's payments for those services, and the

circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

283. As a direct and proximate result of the above-described conduct of the Liberty Defendants, SFM and SFF have been damaged and the Liberty Defendants have been enriched by more than $1,500,000, including damages of at least $1,200,000 incurred by SFM, and damages of at least $300,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Liberty Defendants jointly and severally for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

**TWELFTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**

**(Against Liberty)**

284. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

285. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

286. There is an actual case or controversy between SFM and SFF, on the one hand, and Liberty, on the other hand, as to all charges for examinations, diagnoses, and treatments that have not been paid through the pendency of this litigation. SFM and SFF contend that Liberty is not entitled to reimbursement for any of these charges.

287. Because Liberty has made false claims and fraudulent statements, otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to SFM and SFF, and otherwise submitted claims that are not entitled to reimbursement, Liberty is not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE, SFM and SFF respectfully request a judgment declaring that Liberty is not entitled to collect No-Fault Benefits for any unpaid charges to date and through the pendency of this litigation, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

**THIRTEENTH CLAIM FOR RELIEF**
**COMMON LAW FRAUD**

**(Against Slade, Eastside, Barg, Mukamal, Bey, Bazzazieh, and Butler)**

288. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

289. Defendants Slade, Eastside, Barg, Mukamal, Bey, Bazzazieh, and Butler (the "Eastside Defendants") conspired, agreed, acted in concert, and assisted one another to, and did, intentionally and knowingly make false and fraudulent statements of material fact to SFM and SFF by submitting, and/or causing to be submitted, bills and supporting documentation that contained false representations of material fact concerning patients treated at Eastside.

290. The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 5, 15, and 16 that: (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when the Eastside Defendants did not legitimately reach such conclusions; and (c) the treatment and services were medically necessary, when, in fact, they were not, but were provided pursuant to the Predetermined Treatment Protocol, not to address the unique needs of individual patients.

291. The Eastside Defendants knew that the above-described misrepresentations made to SFM and SFF relating to the purported examinations, diagnoses, and treatment were false and fraudulent when they were made.

292. The Eastside Defendants made the above-described misrepresentations and engaged in such conduct to induce SFM and SFF into relying on the misrepresentations.

293. As a result of their justifiable reliance on the Eastside Defendants' misrepresentations, SFM and SFF have incurred damages of at least $350,000, including damages of at least $200,000 incurred by SFM, and damages of at least $150,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Eastside Defendants jointly and severally for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## FOURTEENTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT

**(Against Slade, Eastside, Barg, Mukamal, Bey, Bazzazieh, and Butler)**

294. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

295. SFM and SFF conferred a benefit upon the Eastside Defendants by paying their claims for services purportedly provided to patients treated at the Eastside clinic and these Defendants voluntarily accepted and retained the benefit of those payments.

296. Because the Eastside Defendants knowingly submitted, and/or caused to be submitted, bills for services that were not medically necessary, and because the Eastside Defendants accepted the payments for the aforementioned services, the Eastside Defendants know of and appreciate the benefit of SFM's and SFF's payments for those services, and the

circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

297. As a direct and proximate result of the above-described conduct of the Eastside Defendants, SFM and SFF have been damaged and the Eastside Defendants have been enriched by more than $350,000, including damages of at least $200,000 incurred by SFM, and damages of at least $150,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Eastside Defendants jointly and severally for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

**FIFTEENTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**

**(Against Eastside)**

298. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

299. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

300. There is an actual case or controversy between SFM and SFF, on the one hand, and Eastside, on the other hand, as to all charges for examinations, diagnoses, and treatments that have not been paid through the pendency of this litigation. SFM and SFF contend that Eastside is not entitled to reimbursement for any of these charges.

301. Because Eastside has made false claims and fraudulent statements, otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to SFM and SFF, and otherwise submitted claims that are not entitled to reimbursement, Eastside is not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE, SFM and SFF respectfully request a judgment declaring that Eastside is not entitled to collect No-Fault Benefits for any unpaid charges to date and through the pendency of this litigation, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

**SIXTEENTH CLAIM FOR RELIEF**
**COMMON LAW FRAUD**

**(Against Slade, Mondawmin, Barg, Bey, Bazzazieh, Butler, and Kampmann)**

302. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

303. Defendants Slade, Mondawmin, Barg, Bey, Bazzazieh, Butler, and Kampmann (the "Mondawmin Defendants") conspired, agreed, acted in concert, and assisted one another to, and did, intentionally and knowingly make false and fraudulent statements of material fact to SFM and SFF by submitting, and/or causing to be submitted, bills and supporting documentation that contained false representations of material fact concerning patients treated at Mondawmin.

304. The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 6, 17, and 18 that: (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when the Mondawmin Defendants did not legitimately reach such conclusions; and (c) the treatment and services were medically necessary, when, in fact, they were not, but were provided pursuant to the Predetermined Treatment Protocol and not to address the unique needs of individual patients.

305. The Mondawmin Defendants knew the above-described misrepresentations made to SFM and SFF relating to the purported examinations, diagnoses, and treatment were false and fraudulent when they were made.

306. The Mondawmin Defendants made the above-described misrepresentations and engaged in such conduct to induce SFM and SFF into relying on the misrepresentations.

307. As a result of their justifiable reliance on the Mondawmin Defendants' misrepresentations, SFM and SFF have incurred damages of at least $1,800,000, including damages of at least $1,100,000 incurred by SFM, and damages of at least $700,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Mondawmin Defendants jointly and severally for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

**SEVENTEENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

**(Against Slade, Mondawmin, Barg, Bey, Bazzazieh, Butler, and Kampmann)**

308. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

309. SFM and SFF conferred a benefit upon the Mondawmin Defendants by paying their claims for services purportedly provided to patients treated at the Mondawmin clinic and these Defendants voluntarily accepted and retained the benefit of those payments.

310. Because the Mondawmin Defendants knowingly submitted, and/or caused to be submitted, bills for services that were not medically necessary, and because the Mondawmin Defendants accepted the payments for the aforementioned services, the Mondawmin Defendants know of and appreciate the benefit of SFM's and SFF's payments for those services, and the

circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

311. As a direct and proximate result of the above-described conduct of the Mondawmin Defendants, SFM and SFF have been damaged and the Mondawmin Defendants have been enriched by more than $1,800,000, including damages of at least $1,100,000 incurred by SFM, and damages of at least $700,000 incurred by SFF.

WHEREFORE, SFM and SFF demand judgment against the Mondawmin Defendants jointly and severally for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

## EIGHTEENTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT

### (Against Mondawmin)

312. SFM and SFF incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 231 above.

313. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

314. There is an actual case or controversy between SFM and SFF, on the one hand, and Mondawmin, on the other hand, as to all charges for examinations, diagnoses, and treatments that have not been paid through the pendency of this litigation. SFM and SFF contend that Mondawmin is not entitled to reimbursement for any of these charges.

315. Because Mondawmin has made false claims and fraudulent statements, otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to SFM and SFF, and otherwise submitted claims that are not entitled to reimbursement, Mondawmin is not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE, SFM and SFF respectfully request a judgment declaring that Mondawmin is not entitled to collect No-Fault Benefits for any unpaid charges to date and through the pendency of this litigation, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), SFM and SFF demand a trial by jury.

Dated: December 14, 2017

Respectfully submitted,

By: /s/ Robert T. Smith
Robert T. Smith
D. Md. Bar No. 19315
KATTEN MUCHIN ROSENMAN LLP
2900 K Street NW, North Tower, Ste. 200
Washington, DC 20007-5118
Telephone: 202.625.3616
Facsimile: 202.339.6059
robert.smith1@kattenlaw.com

Ross O. Silverman
(*pro hac vice* application pending)
John W. Reale
(*pro hac vice* application pending)
Emily J. Prentice
(*pro hac vice* application pending)
Silké G. Watson
(*pro hac vice* application pending)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: 312.902.5200
Facsimile: 312.902.1061
ross.silverman@kattenlaw.com
john.reale@kattenlaw.com
emily.prentice@kattenlaw.com
silke.watson@kattenlaw.com

*Attorneys for Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company*