IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STATE FARM MUTUAL AUTOMOBILE   \*
 INSURANCE COMPANY et al.    \*
  *Plaintiff,*         \*
               \*
 v.             \*    Civil No. ELH-17-3696
               \*
SLADE HEALTHCARE, INC., et al.   \*
  *Defendants.*        \*

           \*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OPINION

Plaintiffs State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire") (collectively, "State Farm") filed suit against twenty-three defendants, alleging fraud and unjust enrichment in connection with medical treatment provided to individuals injured in motor vehicle accidents. These individuals were eligible for so called "no-fault benefits" from State Farm under Maryland's personal injury protection law. ECF 1 ("Complaint").[1] State Farm seeks compensatory damages as well as a declaratory judgment that it need not pay outstanding medical claims during the pendency of this suit. The 315-paragraph Complaint is supported by 40 exhibits. *See* ECF 1-2 to ECF 1-41. Jurisdiction is founded on diversity of citizenship. *See* 28 U.S.C. § 1332; ECF 1, ¶ 13.

The defendants consist of four related groups, who allegedly acted in concert. The first group is composed of six medical clinics: (1) Mondawmin Medical Center, Inc. ("Mondawmin"); (2) Alameda Medical Center, Inc.; (3) Mount Clare Medical Center, Inc.; (4) Erdman Medical Center, Inc.; (5) Liberty Medical & Injury Center, Inc.; and (6) Eastside Medical Center, Inc. ("Eastside") (collectively, the "Clinics"). ECF 1, ¶¶ 17-36. The second group consists of twelve

---

[1] For the purpose of this Memorandum Opinion, I shall refer to plaintiff, rather than plaintiffs.

physicians and chiropractors who provided treatment and services for the patients of the Clinics: Ronald Mukamal, M.D.; Michael Mozes Enoch, M.D.; Patricia Bey, M.D.; Nava Bazzazieh, D.C.; Randy Hallman, D.C.; Timothy Owen, D.C.; Wayne Sodano, D.C.; Lance Miller, D.C.; Tiffany Butler, D.C.; Ekele Enyinnaya, D.C.; Scot Kampmann, D.C.; and Stephen Doyle, D.C. (collectively, the "Providers"). *Id.* ¶¶ 37-53.

The third group comprises four of the officers and directors of the Clinics: Yevgeniy Barg; Mikhail Podinovsky (also known as Michael Podin); Alexander Morin; and Elina Morin (collectively, the "Owners"). *Id.* ¶¶ 54-58. They allegedly designed and directed the fraudulent scheme. *Id.* ¶ 8. The remaining defendant is Slade Healthcare, Inc. ("Slade"), whose website advertises the Clinics' services and the Providers' medical background. *Id.* ¶¶ 49-53; *see, e.g.*, *id.* ¶¶ 37-39. Slade allegedly recruited and directed patients to the Clinics. *Id.* ¶ 8.

In a section of the suit titled "Causes of Action," plaintiff sets forth eighteen claims for relief. *See* ECF 1 at 68-85. They include, multiple claims for common law fraud, unjust enrichment, and declaratory judgment. *Id.*

The Clinics, Owners, and Slade (ECF 43) and the Providers (ECF 52) answered in part and countersued, which they subsequently amended. ECF 65 (the Clinics, Owners, and Slade's Amended Counterclaim); ECF 66 (the Providers' Amended Counterclaim) (collectively, the "Amended Counterclaim"). The Amended Counterclaims allege defamation (ECF 65, ¶¶ 25-32; ECF 66, ¶¶ 25-32); tortious interference with prospective business advantage (ECF 65, ¶¶ 33-41; ECF 66, ¶¶ 33-41); and civil conspiracy. ECF 65, ¶¶ 42-46; ECF 66, ¶¶ 42-46.[2]

In addition, the Clinics, Owners, and Slade jointly moved to dismiss under Fed. R. Civ. P.

---

[2] Because the Amended Counterclaims are similar, for convenience, I shall hereafter cite only to ECF 65 and shall refer to them as the "Amended Counterclaim."

12(b)(6) (ECF 44), supported by a memorandum of law (ECF 44-1) (collectively, the "Clinic Motion") and exhibits. *See* ECF 44-2 to ECF 44-3. They seek dismissal of State Farm's declaratory judgment claims and claims of fraud and unjust enrichment as to claim payments made by State Farm prior to December 14, 2014. ECF 44-1. However, as to the counts of fraud and unjust enrichment, these defendants do not assert that the Complaint fails to state a claim.

Pursuant to Rule 12(b)(6), the Providers have also moved to dismiss (ECF 55), supported by a memorandum of law. ECF 55-1 (collectively, the "Provider Motion"). Like the Clinics, Owners, and Slade, the Providers seek dismissal of State Farm's declaratory judgment claims and claims of fraud and unjust enrichment as to payments made prior to December 14, 2014. ECF 55-1. In addition, the Providers seek dismissal of all unjust enrichment claims, but they do not seek dismissal of all the fraud claims. *Id.*

State Farm opposes the Clinic Motion. ECF 68. The Clinics, Owners, and Slade replied (ECF 71) and submitted additional exhibits. ECF 71-1 to ECF 71-10. State Farm also opposes the Provider Motion. ECF 68. The Providers replied. ECF 72. In addition, the Clinics, Owners, and Slade filed a letter (ECF 88) notifying the Court of a recent decision issued by Judge Catherine Blake in *State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic, LLC*, CCB-18-1279, 2018 WL 6514797 (D. Md. Dec. 11, 2018). State Farm responded. ECF 89.

For its part, State Farm has filed a motion to dismiss the Amended Counterclaim (ECF 69), pursuant to Rule 12(b)(6), supported by a memorandum of law (ECF 69-1) (collectively, the "State Farm Motion") and exhibits. ECF 69-2 to ECF 69-4. The defendants jointly oppose the State Farm Motion (ECF 77) and State Farm has replied. ECF 81.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons set forth below, I shall deny the Clinic Motion and the Provider Motion and grant the State Farm Motion.

## I.      Factual Background[3]

This dispute concerns alleged fraud with regard to thousands of medical claims submitted to State Farm in connection with treatment rendered by defendants to patients who had motor vehicle insurance through State Farm. The Providers and Clinics provide chiropractic and rehabilitative medical services at the Clinics.  Slade maintains a website that "advertises the services provided by the Clinics and provides prospective patients with phone numbers they can call to make appointments at any of Slade's locations." ECF 1, ¶ 51

Pursuant to Maryland's personal injury protection law (the "PIP" law), Md. Code (2017 Repl. Vol., 2018 Supp.), § 19-505(a)(1)-(3) of the Insurance Article ("Ins."), a motor vehicle liability insurer must provide coverage for the medical expenses of persons involved in motor vehicle accidents.  Ins. §  19-505(a)(1)-(3) provides, in part: "[E]ach insurer that issues, sells, or delivers a motor vehicle liability insurance policy in the State shall provide coverage for [] medical, hospital, and disability benefits" to the named insured, any family member residing in the insured's household, any individual injured while using the insured motor vehicle with the permission of the named insurer, any individual injured while in the insured motor vehicle, or any individual injured in an accident involving the insured motor vehicle while a pedestrian or operating an animal-operated vehicle or a bicycle.  *See* ECF 1, ¶ 59.

---

[3] In light of the posture of the case, with regard to motions to dismiss the Complaint, I shall assume the truth of the facts alleged in the Complaint.  Similarly, in regard to the motion to dismiss the Amended Counterclaim, I shall assume the truth of the allegations in the Amended Counterclaim.

The PIP benefits cover at least $2,500 of "all reasonable and necessary [medical] expenses that arise from a motor vehicle accident and that are incurred within 3 years after the accident[.]" Ins. § 19-505(b)(2)(i); ECF 1, ¶ 60. Notably, these benefits are "payable without regard to . . . the fault or nonfault of the named insured or the recipient of benefits in causing or contributing to the motor vehicle accident[.]" *Id.* § 19-507(a)(1); ECF 1, ¶ 61. Such benefits are often referred to as "no fault" benefits.

Insurers, such as State Farm, must "make all payments of [these] benefits [to covered individuals, such as accident victims] . . . periodically as claims for the benefits arise and within 30 days after the insurer receives satisfactory proof of claim." Ins. § 19-508(a); ECF 1, ¶ 62. If an insurer fails to make timely payment, it must pay the claimant "simple interest" on the overdue payments "at the rate of 1.5% per month." Ins. § 19-508(c); Code of Maryland Regulations 31.15.07.06.

State Farm alleges that the defendants are engaged in a fraudulent medical billing scheme. According to plaintiff, from at least April 2010 through the suit's commencement on December 14, 2017, the Clinics and Providers have provided treatment and submitted medical bills that "exploit patients' insurance benefits rather than address the patients' true unique needs." ECF 1, ¶¶ 7, 17. In particular, State Farm asserts that the medical bills and supporting documentation are "the product of a fraudulent, predetermined treatment protocol" (the "Protocol") provided by the Clinics and Providers to accident victims. *Id.* ¶ 3. According to State Farm, the Protocol is intended to, *id.*:

> (a) enable the Defendants to fully exploit and collect the patients' No-Fault Benefits, which were typically $2,500; (b) not refer the patients to any other health care provider for any other reason, including diagnostic testing (e.g., x-rays, MRIs), physical therapy, or consultations by physicians such as orthopedists or neurologists, to avoid potentially having to share the patients' No-Fault Benefits; and (c) keep the total medical expenses to less than $6,000 to "fly under the radar"

of, and encourage settlements by, the insurance companies to which claims for payment are made and thereby incentivize the patients' lawyers ("PI Attorneys") to refer more clients to the Defendants.

Further, State Farm alleges that the Protocol involves several steps: (1) an initial examination that is intended not to diagnose patients properly and design a treatment plant, but to report "substantially similar findings to justify a predetermined course of treatment;" (2) a treatment plan consisting of "substantially the same three or more modalities, plus chiropractic manipulations, provided to almost every patient on almost every visit, regardless of the unique circumstances and needs of each patient, to support at least four separate charges for each visit;" (3) patient discharge from treatment when the defendants' charges total $6,000 or less, regardless of the patient's condition; and (4) submission of documentation to State Farm representing that the examinations and treatments were medically necessary. *Id.* ¶ 4.

The Protocol also "involves the absence of patient referrals for consultations with any other medical professionals . . . who have expertise in diagnosing and treating injuries that the patients might actually have, or to any other providers for diagnostic testing . . . , which might be necessary to diagnose and arrive at an appropriate treatment plan for injuries that patients might actually have." *Id.* ¶ 5. In State Farm's view, such referrals would be in the best interest of some patients, but against the financial interest of defendants, "because any such referrals would likely deplete or exhaust the No-Fault Benefits available to the Defendants if those benefits are also owed to other providers." *Id.*

According to the Complaint, each of the participants (the Owners, the Clinics, Slade, and the Providers) "had a critical role in the scheme, with each needing the others to successfully carry out and profit from the scheme." *Id.* ¶ 8. State Farm claims that the Owners "through their overlapping ownership interests and control of Slade and the Clinics, were able to design, direct,

and oversee the implementation of the Predetermined Treatment Protocol at the Clinics." *Id.* Slade "recruited and funneled to the respective Clinics patients who were the lifeblood of and essential to the economic success of the scheme by advertising the Clinics' services, obtaining information from prospective patients online and through a toll-free number, and arranging appointments for the prospective patients at the respective Clinics." *Id.* And, the Providers "were necessary to the success of the scheme because the laypersons who owned Slade and the Clinics could not prescribe and provide any of the goods and professional services." *Id.* In other words, the Providers rendered the treatment that was the subject of the fraudulent bills submitted to State Farm.

State Farm also asserts that the Clinics and Providers treated patients who were in staged accidents and therefore not actually injured. *Id.* ¶ 191. The Complaint alleges staged accidents occurring on five separate dates between November 13, 2011 and March 24, 2016. *Id.* ¶¶ 191-227. After each staged accident, at least some of the purported accident victims sought care from the Clinics and Providers. *Id.* ¶¶ 196-99, 211-214, 221, 224-27. State Farm alleges that even though these individuals "could not have been injured because they were not in actual accidents," they "received the same Predetermined Treatment Protocol as the other patients at the Clinics." *Id.* ¶ 191.

As noted, defendants have lodged counterclaims against State Farm for defamation (ECF 65, ¶¶ 25-32); tortious interference with prospective business advantage and economic and business relationships (*id.* ¶¶ 33-41); and civil conspiracy. *Id.* ¶¶ 42-46. They allege, *inter alia*, that State Farm has falsely "notified third parties expressly and by innuendo of its dishonesty and fraud claims about the Medical Clinics, their owners, and the Treatment Providers who provide medical services to injured accident victims at the Medical Clinics." *Id.* ¶ 12.

Further, they maintain that State Farm has sued them as part of "a nationwide scheme

targeting medical providers treating lower income, minority and immigrant accident victim patients who live in urban areas[.]" ECF 65, ¶ 1. State Farm, they claim, creates these "manufactured and knowingly false accusations of fraud" to eliminate medical providers, like the Clinics and Providers, "as sources of available treatment for urban lower income, minority, and immigrant accident victims, and to dramatically drive down medical and bodily injury payments in auto accident claims submitted to State Farm across the county." *Id.* ¶¶ 1-2, 7.

According to the Amended Counterclaim, State Farm has "proclaimed that it will not pay any future claims for medical treatment" provided by the Clinics. *Id.* ¶ 16. And, it has allegedly told accident victims and third parties that it is denying the medical treatment claims because (1) "State Farm has filed a lawsuit against" the Clinics and Providers, *id.* ¶ 15, and (2) the Clinics, Providers, and Owners "have [engaged] and are engaging in fraud and dishonesty." *Id.* ¶ 17. The counterclaimants allege that the insurer is "publishing" these claims "for the purpose of deterring injured accident victims from obtaining medical treatment at the Medical Clinics." *Id.* Moreover, State Farm has allegedly told accident victims and their attorneys that it is rejecting "medical treatment expense claims if the medical expenses relate to medical treatment provided" by the Providers or Clinics. *Id.* ¶ 23. Further, defendants assert that State Farm has acted with "malice and intent to injure" them. *Id.* ¶ 20.

The counterclaimants do not clearly state in their Amended Counterclaim whether these statements were made orally or in writing. But, they refer to "oral statements" in their opposition to the State Farm Motion. *See, e.g.*, ECF 77 at 15, 17. Therefore, I shall assume that the statements referenced above were made orally.

In addition, the counter-plaintiffs assert that State Farm has sent claim denial letters to various persons alerting them to the ongoing litigation, "so that current and future patients and

their and other lawyers will know the details of State Farm's defamatory . . . statements . . . and will not obtain treatment at and/or refer patients to the Medical Clinics in the future." ECF 65, ¶ 23.  They also submitted as an exhibit a copy of a claim letter denial.  ECF 69-3 at 2-3. In relevant part, the letter states, *id.* at 2: "At this time, State Farm . . . is denying payment of these bill(s) because the matters giving rise to the charges are at issue in a pending civil lawsuit between East Side Medical Center and State Farm."

Additional facts are included in the Discussion.

## II.      Standard of Review

### A.      Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see*

*Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from

the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). The court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*,

\_\_\_ U.S. \_\_\_, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

State Farm submitted 40 exhibits with its Complaint. These include lists of medical claims for services provided by the Clinics and Providers (ECF 1-2 to ECF 1-20); for each Clinic, exemplar reports of initial chiropractic and medical doctor examinations (ECF 1-21 to 1-32); deposition transcripts (ECF 1-33 to ECF 1-38); an investigator report (ECF 1-39); and the complaint (ECF 1-40) and docket in a different suit (ECF 1-41). Because these exhibits were submitted with the Complaint, and are incorporated in it, I may consider them without converting the State Farm Motion to one for summary judgment.

The Clinics, Owners, and Slade attach two exhibits to their Motion: a transcript of a deposition (ECF 44-2) and a Maryland Insurance Administration bulletin (ECF 44-3). Because the transcript is part of the same deposition (ECF 1-33) that plaintiff "explicitly incorporated into the complaint by reference and . . . attached to the complaint," the document is integral and the Court may consider it as to defendants' motions to dismiss. *Zak*, 780 F.3d at 606 (internal quotation omitted). Although the bulletin is not integral to the Complaint, the Court may take judicial notice of it. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record.").

With their reply, the Clinics, Owners, and Slade also submitted an order (ECF 71-1) in a different suit brought by State Farm, excerpts from complaints in several suits filed by State Farm (ECF 71-3 to 71-10), and a table summarizing those complaints. ECF 71-2. I may take judicial notice of the order and complaints as they are matters of public record. The table is neither integral to the Complaint nor a matter of public record. Accordingly, I shall not consider it in the context of this Memorandum Opinion.

State Farm, as counter-defendant, attached to its motion to dismiss two exhibits and a sworn declaration in support of their authenticity. ECF 69-2. The first is a claim denial letter (ECF 69-3 at 2-3), and the second is an explanation of benefits (ECF 69-3). The counter-plaintiffs also submitted a claim denial letter (ECF 77-1 at 2) and an explanation of benefits (ECF 77-1 at 3-6). The claim denial letters are virtually the same. *Compare* ECF 69-3 at 2-3 *with* ECF 77-1 at 2.

Because the claim denial letters and explanations of benefits were referenced in the Amended Counterclaim as a basis for the defamation and tortious interference claims, they are

integral to the suit. *See Goldfarb*, 791 F.3d at 508. Therefore, I may consider them as to the State Farm Motion.

State Farm also attached a court order (ECF 81-1) in an unrelated suit against parties not named that it brought. Although it is not integral to the Amended Counterclaim, the Court may take judicial notice of it. *See Philips*, 572 F.3d at 180. However, "these facts [must be] construed in the light most favorable" to the non-movant. *Clatterbuck*, 708 F.3d at 557.

## B.       Choice of Law

The parties assume, without discussion, that Maryland law applies to this diversity case. A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *see Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011) ("When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state.") (citing *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 49 n. 11 (4th Cir. 1983)).

Regarding tort claims, Maryland applies the law of the state where the alleged harm occurred ("lex loci delicti"). *See, e.g.*, *Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 625, 925 A.2d 636, 651 (2007); *Phillip Morris, Inc. v. Angeletti*, 358 Md. 689, 744, 752 A.2d 200, 230 (2000). Because the alleged events took place in Maryland, the substantive tort law of Maryland governs the parties' tort claims. *See Hauch v. Connor*, 295 Md. 120, 123-24, 453 A.2d 1207, 1209 (1983).

In a contract claim, including one for unjust enrichment, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Todd v. Xoom Energy Maryland, LLC*, GJH-15-154, 2016 WL 727108, at *6 (D. Md. Feb. 22, 2016) (citations omitted); *Griffith Energy Services, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Va.*, 224 Md. 252, 274, 120 A.3d 800, 821 (2015); *see also Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *U.S. Life Ins. Co. v. Wilson*, 198 Md. App. 452, 462-63, 18 A.3d 110, 116 (2011); *Konover Prop. Tr., Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 489, 790 A.2d 720, 728 (2002). Here, the parties appear to agree that Maryland law covers the contract-related counts of unjust enrichment. *See* ECF 44-1; ECF 55; ECF 68. Accordingly, I will apply Maryland law in addressing these counts.

### III.    Discussion

### A.    Defendants' Motions

### 1.    Statute of Limitations

Defendants argue that State Farm's various claims of fraud and unjust enrichment are time-barred as to payments made prior to December 14, 2014, *i.e.*, three years before State Farm sued the defendants. ECF 44-1 at 8-9, 21-23; ECF 55 at 11-14. Because this case comes to this Court on the basis of diversity jurisdiction, I must apply the substantive law of the forum state, including its statute of limitations. *See Brown v. Am. Broad. Co., Inc.*, 704 F.2d 1296, 1299 (4th Cir. 1983); *see also Coe v. Thermasol, Inc.*, 785 F.2d 511, 514 n.5 (4th Cir. 1986) (noting that "federal courts sitting in diversity apply the forum state's statute of limitations"). Therefore, I shall apply Maryland law.

Under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. Md. Code (2013 Repl. Vol., 2018 Supp.), § 5-101 of the Courts and Judicial Proceedings Article ("C.J."). Tort actions are generally governed by Maryland's three-year statute of limitations. *See Hartnett v. Schering Corp.*, 2 F.3d 90, 92 (4th Cir. 1993). In addition, "[i]f the remedy sought in equity is analogous to a remedy cognizable at law, and the statute of limitations prescribes a time within which the legal action must be instituted, equity will follow the law and bar the action." *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 160 n.2, 857 A.2d at 1099 (2004) (citation omitted).

"Limitations statutes . . . are designed to (1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an unreasonable period of time, and (3) serve society by promoting judicial economy." *Union-Pacific Corp. v. Benjamin*, 394 Md. 59, 85, 904 A.2d 511, 526 (2006); *Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983). "As a general rule, the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time limit for filing the suit." *Newell v. Richards*, 323 Md. 717, 725, 594 A.2d 1152, 1156 (1991).

The question here turns on when the claims accrued for purposes of limitations. An action typically accrues at the time of the wrong, unless a judicial or legislative exception provides otherwise. *Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131, 31 A.3d 212, 236 (2011); *Benjamin*, 394 Md. at 74-75, 904 A.2d at 520. Ordinarily, "'the question of accrual in [C.J.] § 5-101 is left to judicial determination,' unless the determination rests on the resolution of disputed facts regarding discovery of the wrong." *Poole*, 423 Md. at 131, 31 A.3d at 236 (citation omitted); *see Sheff*, 382 Md. at 244, 854 A.2d at 1275 (stating that summary judgment may be appropriate if there is no dispute of material fact as to whether plaintiff was on inquiry notice more than three

years before suit was filed); *Frederick Road Limited Partnership*, 360 Md. at 95, 756 A.2d at 973 (explaining that the determination of accrual "may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute and the facts to which it is applied").

Of relevance here, "[r]ecognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury," Maryland has adopted the so-called discovery rule to determine the date of accrual. *See Bank of New York v. Sheff*, 382 Md. 235, 244, 854 A.2d 1269, 1275 (2004); *Frederick Road Limited Partnership v. Brown & Sturm*, 360 Md. 76, 95, 756 A.2d 963, 973 (2000). "The discovery rule acts to balance principles of fairness and judicial economy in those situations in which a diligent plaintiff may be unaware of an injury or harm during the statutory period." *Dual Inc.*, 383 Md. at 167, 857 A.2d at 1104.

Under the discovery rule, "a plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010) (citing *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 749 A.2d 796, 801 (2000)), *aff'd*, 495 Fed. Appx. 350 (4th Cir. 2012). Notably, "[t]his standard . . . does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on 'inquiry notice.'" *Dual Inc.*, 383 Md. at 167-68, 857 A.2d at 1104 (citing *Am. Gen. Assurance Co. v. Pappano*, 374 Md. 339, 351, 822 A.2d 1212, 1219 (2003); *Doe v. Archdiocese of Washington*, 114 Md. App. 169, 188-89, 689 A.2d 634, 644 (1997)). A plaintiff is on inquiry notice when the plaintiff "possesses 'facts sufficient to cause a reasonable person to investigate further, and . . . a diligent investigation would have revealed that the plaintiffs were victims of . . . the alleged tort.'" *Dual Inc.*, 383 Md. at 168, 857 A.2d at 1095 (quoting *Pennwalt*

*Corp. v. Nasios*, 314 Md. 433, 448-49, 550 A.2d 1155, 1159 (1988)) (alterations in original). Inquiry notice must be actual notice, either express or implied. *Poffenberger v. Risser*, 290 Md. 631, 636-38, 431 A.2d 677, 680-81 (1981). But "[c]onstructive notice or knowledge will not suffice for inquiry notice." *Benjamin*, 394 Md. at 89, 904 A.2d at 529; *see Poffenberger*, 290 Md. at 637, 431 A.2d at 681.

Application of the discovery rule involves a two-prong test. The Maryland Court of Appeals has explained that the first prong, "sufficiency of the actual knowledge to put the claimant on inquiry notice," concerns "the nature and extent of actual knowledge necessary to cause an ordinarily diligent plaintiff to make an inquiry or investigation that an injury has been sustained." *Benjamin*, 394 Md. at 89, 904 A.2d at 529; *see Pennwalt*, 314 Md. at 453, 550 A.2d at 1165-66 (noting that a plaintiff must have notice of the nature and cause of his or her injury). "'Express knowledge is direct, whether written or oral, from sources 'cognizant of the fact[s].'" *Benjamin*, 394 Md. at 89, 904 A.2d at 529 (quoting *Poffenberger*, 290 Md. at 636-37, 431 A.2d at 681) (citation omitted). Implied notice occurs "when a plaintiff gains knowledge sufficient to prompt a reasonable person to inquire further." *Pennwalt*, 314 Md. at 447, 550 A.2d at 1163.

The second prong, "the sufficiency of the knowledge that would have resulted from a reasonable investigation," requires that after a reasonable investigation of facts, a reasonably diligent inquiry would have disclosed whether there is a causal connection between the injury and the wrongdoing. *Benjamin*, 94 Md. at 90, 904 A.2d at 529; *see Pennwalt*, 314 Md. at 452, 550 A.2d at 1165; *Baysinger v. Schmid*, 307 Md. 361, 367-68, 514 A.2d 1, 4 (1986). "The requirement for inquiry notice is that if a person investigates diligently, the causal connection would be revealed." *Benjamin*, 94 Md. at 90, 904 A.2d at 529.

As noted earlier, and of critical importance here, courts generally do not resolve the applicability of affirmative defenses, such as limitations, through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243. Indeed, the circumstances are "relatively rare" where the facts in a complaint are sufficient to support a ruling on such a defense at the motion to dismiss stage. *Goodman*, 494 F.3d at 464; *see Pressley*, 553 F.3d at 336. Therefore, a trial court ordinarily does not grant a motion to dismiss "based on the assertion that the cause of action is barred by the statute of limitations unless it is clear from the facts and allegations on the face of the complaint that the statute of limitations has run." *Litz v. Maryland Dep't of Env't*, 434 Md. 623, 641, 76 A.3d 1076, 1086 (2013); *accord Rounds v. Maryland-Nat. Capital Park & Planning Comm'n*, 441 Md. 621, 655, 109 A.3d 639, 659 (2015).

In this case, it is patently clear that, on the face of the Complaint, I cannot conclude that claims paid by State Farm prior to December 14, 2014 are barred by limitations.

In defendants' view, State Farm was on inquiry notice as early as December 11, 2012, when its attorney deposed Walter Kozachuk, M.D. in connection with an earlier suit brought against State Farm. ECF 44-1 at 9; *see Robinson v. State Farm*, Circuit Court of Baltimore City, No. 24-C-12-003732 MT; ECF 1-33 (Deposition of Dr. Kozachuk). Defendants observe that State Farm's attorney asked Dr. Kozachuk several questions indicating that State Farm already believed the Clinics were engaged in a fraudulent protocol. ECF 55-1 at 12. Moreover, they maintain that Dr. Kozachuk's testimony should have alerted State Farm that the Clinics were allegedly engaged in fraudulent practices. *Id.* at 13.

State Farm counters that the Court should accept the allegations in the Complaint (ECF 1, ¶ 12) that plaintiff did not discover the Protocol "until sometime after the Fall of 2016," after State Farm was "able to begin to identify the fraudulent patterns described herein in the bills and

supporting documentation across more than 4,000 patients." ECF 68 at 19. Further, in its view, "[e]ach bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature." ECF 1, ¶ 12; ECF 68 at 19. Additionally, State Farm asserts that this issue turns on disputed facts and is therefore not properly resolved in connection with a motion to dismiss. ECF 68 at 21-22.

According to the Complaint, "Walter Kozachuk, a medical doctor who treated patients at Mondawmin, among other Clinics, testified in a December 2012 deposition that 'Slade,' an entity named as a defendant in this action, did not permit patients to be referred for outside services, even when it was in the best interests of the patients." ECF 1, ¶ 5. Dr. Kozachuk treated patients at Mondawmin, Eastside, and possibly other Clinics. ECF 1, ¶¶ 5, 158. The Complaint later alleges that he "testified he 'wanted to order more complex studies, MRIs, EMG,' but 'Slade' thought it was too costly." *Id.* ¶ 179 (quoting ECF 1-33 at 7-8, pp. 60-64). Dr. Kozachuk was concerned that Slade refused to order tests he believed were necessary. *Id.* ¶ 179. He "explained that the refusal to order such tests 'wasn't in the best interest of the patients.'" *Id.* (quoting ECF 1-33 at 9, pp. 66-67).

Dr. Kozachuk was so concerned that he "'talk[ed] to the owners [of Slade] a few times,' as well as to the office managers about the fact that he had ordered tests and later found out they were not done." *Id.* (quoting ECF 1-33 at 9 p. 68) (second alteration in original). According to Dr. Kozachuk, Slade personnel told him that he could not order certain tests for patients. ECF 1-33 at 8 pp. 61-64. Slade management told Dr. Kozachuk, "'The tests were too expensive for the case[.]'" *Id.* at 9 p. 65. Dr. Kozachuk told State Farm's attorneys that when he "'ran into that road block, [he] left.'" ECF 1, ¶ 179 (quoting ECF 1-33 at 9, pp. 67) (alteration in original).

The Complaint also highlights Dr. Kozachuk's testimony that "'a lot of times [he] felt that the patient needed more therapy [when] they were discharged', which was 'disconcerting.'" *Id.* (citing ECF 1-33 at 12, p. 128). Thus, defendants argue that Dr. Kozachuk put State Farm on inquiry notice as to central elements of the alleged protocol. Because the no-fault benefits typically cover $2,500 in medical expenses for each accident victim, the defendants allegedly sought to capture as much of these benefits as possible for themselves by refusing to refer patients to other providers, consistent with Dr. Kozachuk's concerns. ECF 1, ¶ 3. In other words, referring accident victims to providers outside of the Clinics would deplete the amount of no fault benefits available for defendants.[4]

Even if plaintiff possessed "facts sufficient to cause a reasonable person to investigate further," the parties dispute whether "a diligent investigation would have revealed that the plaintiffs were victims of . . . the alleged tort.'" *Dual Inc.*, 383 Md. at 168, 857 A.2d at 1095 (internal quotation omitted). State Farm alleges that it "did not discover and should not have reasonably discovered" the fraudulent billing "until sometime after the Fall of 2016," after it was "able to begin to identify the fraudulent patterns described herein in the bills and supporting documentation across more than 4,000 patients." ECF 1, ¶ 12. It contends that "[e]ach bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature." *Id.* ¶ 12. Rather, the fraud emerges "[o]nly when the bills and supporting documentation across all claims at issue are viewed together as a whole." *Id.* ¶ 12.

State Farm does not explain why it needed 4,000 claims to attempt an investigation. According to the Clinics, Owners, and Slade, plaintiff's exhibits (ECF 1-2 to ECF 1-7) "detail the

---

[4] Defendants also allege that State Farm had already analyzed claims data before deposing Dr. Kozachuk. This allegation is not rooted in the Complaint or incorporated exhibits.

1,605 claims" State Farm had received from the Clinic defendants between April 1, 2010 and December 6, 2012. ECF 71 at 11 n. 2; *cf. State Farm v. Carefree Land Chiropractic, LLC*, CCB-18-1279, ECF 50, at 1 (D. Md. Dec. 11, 2018) (footnote omitted) (emphasis added) (plaintiff alleging a similar protocol "for chiropractic services and treatments provided to *550 patients* pursuant to various personal injury claims submitted by the patients."). But, whether State Farm needed to review as many as 4000 claims is not dispositive of the issue. A court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440.

It appears that Dr. Kozachuk's deposition was taken in a case where the defendants here were not even parties. Indeed, the Court does was not briefed on the nature of the case and the deposition's relationship to it. Therefore, the Court has no reason to believe that a deposition in an apparently unrelated case should place State Farm on inquiry notice. Further, the deposition does not, on its face, establish the bar of limitations as to the issues and defendants in this case. Dr. Kozachuk's testimony as to Slade and the practices at Mondawmin cannot be used to impute fraud to 21 other defendants, or a fraud scheme of the magnitude alleged here. Indeed, his testimony suggests that the Providers may have been unaware of the Protocol. During the deposition, Dr. Kozachuk was confused when State Farm's counsel referred to a "protocol," and he testified that he was "not aware" of a protocol. ECF 1-33 at 6, pp. 51-52. Further, even as to Slade and Mondawmin, Dr. Kozachuk's testimony does not, on its own, establish inquiry notice as to the fraud scheme alleged in the Complaint.

In sum, on the face of the Complaint the facts and allegations do not lead to the conclusion, as a matter of fact or law, that State Farm's deposition of one doctor, who worked with a limited

number of people, apparently at limited locations, put State Farm on inquiry notice as to an alleged massive fraud scheme.

## 2. Unjust Enrichment

As noted, State Farm has sued for unjust enrichment. The Complaint alleges that State Farm conferred a benefit on the defendants, including the Providers, by paying their medical treatment claims. *See, e.g.*, ECF 1, ¶¶ 239, 253, 267. State Farm also alleges that the defendants accepted payments for providing fraudulent medical services. *See, e.g.*, *id.*

The Providers move to dismiss, claiming that they derived no benefit from the alleged enterprise and therefore they were not unjustly enriched. ECF 55-1 at 9-10.

Unjust enrichment is a remedy "'to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided.'" *Cty. Comm'rs of Caroline Cty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96-97, 747 A.2d 600, 607 (2000) (quoting *Dunnaville v. McCormick & Co.*, 21 F. Supp. 2d 527, 535 (1998)). "'In an action for unjust enrichment the burden is on the plaintiff to establish that the defendant holds plaintiff's money and that it would be unconscionable for him to retain it.'" *Bank of America Corp. v. Gibbons,* 173 Md. App. 261, 268, 918 A.2d 565 (2007) (quoting *Plitt v. Greenberg*, 242 Md. 359, 364, 219 A.2d 237 (1966)).

In Maryland, a claim of unjust enrichment is established when: "(1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 389 Md. 615, 651-52, 887 A.2d 525, 546 (2005) (citation omitted); *see also Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 351 (2007); *Dashiell*, 358

Md. at 95 n.7, 747 A.2d at 607 n.7; *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 574, 952 A.2d 304, 327, *cert. denied*, 406 Md. 444, 959 A.2d 793 (2008); *Swedish Civil Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190 F. Supp. 2d 785, 792-93 (D. Md. 2002).

"A person confers a benefit upon another if he gives to the other possession of or some other interest in money[.]" RESTATEMENT OF RESTITUTION § 1 cmt. b (1937, updated through 2019). An unjust enrichment claim deprives the defendant of benefits that would be inequitable for the defendant to retain. *Hill*, 402 Md. at 295, 936 A.2d at 352. The plaintiff may prevail even if the defendant "'received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'" *Id.* at 296, 936 A.2d at 352 (citation omitted). "A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment." *Berry & Gould v. Berry,* 360 Md. 142, 151, 757 A.2d 108 (2000) (quoting RESTATEMENT (SECOND) OF RESTITUTION § 1 (Tentative Draft No. 1, 1983)). *See Gibbons*, 173 Md. App. at 267, 918 A.2d 565.

The doctrine of unjust enrichment applies where "'the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money,' and gives rise to the policy of restitution as a remedy." *Hill*, 172 Md. App. 350, 914 A.2d 231 (citations omitted). "The restitutionary remedies and unjust enrichment are simply flip sides of the same coin." *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of School Comm'rs*, 155 Md. App. 415, 454, 843 A.2d 252 (2004). Thus, "[r]estitution involves the disgorgement of unjust enrichment." *Consumer Protection Div. v. Morgan,* 387 Md. 125, 168, 874 A.2d 919 (2005).

In an unjust enrichment action, the defendant need not have received the benefit "necessarily and directly . . . from the plaintiff's own resources." *Hill*, 402 Md. at 298, 936 A.2d

at 353. Where the defendant received the money from a third-party, the plaintiff may prevail if "in equity and good conscience, [the defendant] is not entitled to hold it against the true owner." *Plitt*, 242 Md. at 364, 219 A.2d at 241 (quoting *Empire Oil Co. v. Lynch*, 106 Ga. App. 42, 126 S.E.2d 478, 479 (1963)). But, "[g]enerally, courts . . . allow unjust enrichment claims only when there is evidence of fraud or bad faith,[] there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted,[] or when the express contract does not fully address a subject matter.[]" *J. Roland Dashiell & Sons, Inc.*, 358 Md. at 100, 747 A.2d at 608-09.

The Providers claim that they did not benefit from the alleged protocol. They maintain that they were paid a fixed hourly rate as independent contractors and therefore enjoyed no benefit. ECF 55-1 at 10-11. But, at the motion to dismiss stage, the Court must rely on the facts pleaded in the Complaint, not the defendants' allegations about the terms of their compensation. *See E.I. du Pont de Nemours & Co.*, 637 F.3d at 440.

At the 12(b)(6) stage, when the complaint adequately alleges the "defendants act[ed] in concert to unjustly obtain benefits, each can be held to have been unjustly enriched by virtue of the benefit derived from the scheme, even if the benefit was not conferred on them directly." *See State Farm Mut. Auto. Ins. Co. v. Brown*, No. 16-80793-CIV, 2017 WL 1291995, at *7 (S.D. Fla. Mar. 30, 2017). That is, to support the claim, the complaint need not contain explicit allegations that each defendant directly benefited from the scheme. *State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C.,* No. 2007-cv-0051-ENV-MDG, 2007 WL 2908205, at *3 (E.D.N.Y. Oct. 4, 2007) (concluding that allegations of collusion between defendants sufficed to establish a plausible claim of unjust enrichment notwithstanding defendant's argument "that he was simply an employee for the defendant corporations"); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 154 (E.D.N.Y. 2005) ("While . . . there is no explicit allegation stating that

26

defendants received some portion of the more than $2,500,000 paid . . . , it is reasonable to infer that defendants benefitted from the scheme described in the complaint.").

The lists of medical claims for services provided by the Providers support the allegation that the Providers knew of State Farm's payments to the Clinics. *See* ECF 1-2 to ECF 1-20. Further, the Complaint alleges that the Providers engaged in a fraudulent scheme with the Clinics, Owners, and Slade. However, the defendants do not seek dismissal of plaintiff's claims for fraud. *See* ECF 44-1; ECF 55-1. Furthermore, the Providers allegedly engaged in a fraudulent enterprise, by which they benefited from State Farm's payments. State Farm adequately alleges that the Providers participated in a fraudulent enterprise, and that it would be inequitable for the Providers to retain the payments from State Farm.

### 3. Declaratory Judgment Claims

As noted, the Complaint includes several counts seeking declarations that defendants are "not entitled to collect No-Fault Benefits for any unpaid charges to date and through the pendency of this litigation, and for supplementary relief, attorneys' fees, interest, and costs[.]" ECF 1 at 71, 74, 77, 80, 83, 86. The defendants insist that plaintiff is not entitled to declaratory relief, and that plaintiff's declaratory judgment counts are not ripe. ECF 44-1 at 17-18. Also, they allege that the counts are not particularized. *Id.* at 5-7, 14-16, 19-20.

State Farm has not sought a preliminary injunction for an immediate declaration. Therefore, I need not determine whether State Farm is, in fact, entitled to a declaration at this juncture. Rather, I need only determine whether its counts for declaratory judgment survive the motion to dismiss filed by the Clinics, Owners, and Slade.

**i.**

In the federal courts, declaratory judgments are authorized by the federal Declaratory Judgment Act, 28 U.S.C. § 2201, which provides that, in "a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." A federal court may properly exercise jurisdiction in a declaratory judgment proceeding when three requirements are met: "(1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for the jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction." *Volvo Const. Equipment North America, Inc. v. CLM Equipment Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004) (internal quotation marks and citation omitted).

"A case meets the actual controversy requirement only if it presents a controversy that qualifies as an actual controversy under Article III of the Constitution." *Id.* To satisfy the case-or-controversy requirement of Article III of the United States Constitution, the dispute must be "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)); *see Dyer v. Maryland State Bd. of Educ.*, 187 F. Supp. 3d 599, 609 (D. Md. 2016), *aff'd*, 685 F. App'x 261 (4th Cir. 2017); *Peter B. v. Buscemi*, C/A No. 6:10-767-TMC, 2013 WL 869607, at *7 (D.S.C. Mar. 7, 2013) (citing *Green v. Mansour*,

474 U.S. 64, 74 (1985); *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)), *aff'd sub nom. Chip E. v. Buscemi*, 647 Fed. Appx. 219 (4th Cir. 2016) (per curiam).

According to the defendants, State Farm seeks a declaration that "it has no legal obligation to make PIP payments in the future on any future invoices State Farm may receive from the Clinics for medical services provided by the Clinics to as yet unknown State Farm insureds injured in future automobile accidents." ECF 44-1 at 4. State Farm argues that defendants have made a "strawman" by stating that State Farm requests a declaration that "'currently non-existing [and] potential future claims' do not have to be paid." ECF 68 at 24 (quoting ECF 44-1 at 15) (emphasis omitted). But, State Farm then states that it seeks "relief with respect to any unpaid charges *submitted* pursuant to the fraudulent Predetermined Treatment Protocol *through the pendency of the litigation*." ECF 68 at 24 (emphasis added). That is, notwithstanding State Farm's protestations, the insurer seeks a declaration that would apply to "currently non-existing, potential future claims." ECF 44-1 at 15.

State Farm's declaratory judgment counts are ripe. State Farm seeks to avoid the imminent injury that would result from paying for allegedly fraudulent services. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy*, LLC, 68 F. Supp. 3d 744, 756 (E.D. Mich. 2014) ("These unpaid claims are not hypothetical, they have been submitted for payment and State Farm seeks a declaration that they need not pay them because they were submitted as part of the alleged fraudulent billing scheme.").

The fact that defendants have not yet filed some of these claims is not dispositive at this juncture. For example, in *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 797 (E.D. Mich. 2015), State Farm sought a "a declaratory ruling that it need not pay . . . any bills on claims submitted during the pendency of this case that State Farm is able to

prove at trial are false and fraudulent." The district court concluded that the count was "a substantial controversy of sufficient immediacy" and therefore survived the motion to dismiss. *Id.*

**ii.**

The Clinics, Owners, and Slade assert that State Farm's declaratory judgment claims are premised on fraud and therefore the underlying fraud must be pled with particularity. Further, they claim that State Farm does not allege that a "claim-specific analysis has been made of the unpaid claims[.]" ECF 44-1 at 18. But, the Clinics, Owners, and Slade do not move for dismissal of State Farm's fraud claims.

Fed. R. Civ. P. 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.,* 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted).

In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe,* 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted). *See United States ex rel. Grant v. United Airlines Inc.,* 912 F.3d 190, 197 (4th Cir. 2018); *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.,* 707 F.3d 451, 455-56 (4th Cir. 2013)).

Rule 9(b) serves several salutary purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after

discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

Notably, however, Rule 9(b) by its plain text permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784. At trial the plaintiff must establish the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

In *State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic*, *LLC*, *supra*, 2018 WL 6514797, Judge Blake considered a motion to dismiss a similar suit brought by State Farm against medical providers. State Farm alleged that the defendant medical providers were engaged in "a pervasive fraud scheme designed to defraud State Farm of the maximum possible amount of personal injury reimbursements." *Id.* at *1. In support of this claim, they provided extensive statistical data professing to show that patients were provided with nearly identical treatments irrespective of their diagnoses. *Id.* "In essence, State Farm argued that [defendants'] records could not all be true, and therefore must all be false." *Id.* at *3. Judge Blake was not persuaded by the statistical evidence, *id.*:

> That 98% of the 550 patients-received the same treatment plan appears surprisingly high, for example, but it may be that the overwhelming majority of Carefree's 550 patients required similar or identical treatment plans because all had similar or identical injuries that led them to seek Carefree's treatment in the first place.

State Farm did not identify a single patient who received medically unnecessary services. Nor did it "specify which of the 550 patients' records or treatments were fraudulent, and which []

physician provided fraudulent documentation and/or rendered fraudulent treatment for any of those 550 patients." *Carefree*, 2018 WL 6514797, at *3. Judge Blake concluded that the alleged scheme, "absent any identification of a specific fraudulent treatment and/or record," failed to provide "the level of particularity required by *Iqbal* and Rule 8(a)(2)" or to "satisfy Rule 9(b)." *Id.* at *3 (citing *Nathan*, 707 F.3d at 457). Accordingly, the court dismissed the suit.[5]

State Farm pleaded with greater specificity in this case than in *Carefree*. Here, State Farm has submitted statistical analyses in support of its allegations of a fraud scheme. Unlike in *Carefree*, it has also alleged specific facts and incidents to bolster its claims. State Farm's deposition of Dr. Kozachuk is perhaps a thin reed for purposes of inquiry notice or proof. But, this case is not at the proof stage; it is at the Rule 12(b)(6) stage. The allegations about the doctor's prior testimony support the assertion that the defendants prematurely discharged at least some patients and refused to refer some patients for tests or treatments outside of the Clinics. As discussed, Dr. Kozachuk testified that "'a lot of times [he] felt that the patient needed more therapy [when] they were discharged', which was 'disconcerting.'" ECF 1, ¶ 179 (citing ECF 1-33 at 12, p. 128). Further, Slade personnel told him that he could not order certain tests for patients because the "tests were too expensive for the case[.]" ECF 1-33 at 8-9, pp. 61-65.

The complaint in *Carefree* "did not attribute the various allegedly fraudulent documents, records, and treatments to specific physicians, instead electing simply to list Carefree's chiropractors as defendants and allege a collective fraudulent scheme." *Carefree*, 2018 WL 6514797, at *4. Here, State Farm tied specific allegations and medical claims to specific Providers. *See, e.g.*, ECF 1, ¶¶ 114, 147. For example, the Complaint also alleges that three patients in the

---

[5] State Farm has filed a motion for reconsideration, which as of this date is pending. *See Carefree*, ECF 52.

same accident presented "at least some different complaints[,]" but received "virtually identical treatments." ECF 1, ¶ 118

State Farm has provided the defendants with "the particular circumstances for which [they] will have to prepare a defense at trial" and has provided "substantial prediscovery evidence." Accordingly, it has alleged fraud with the sufficient particularity to allow the declaratory judgment claims to proceed.

## B. State Farm Motion

In the Amended Counterclaim, defendants bring three counts: defamation ("Counterclaim Count I"), tortious interference with prospective business relationships ("Counterclaim Count II"), and civil conspiracy ("Counterclaim Count III"). State Farm maintains that each count fails to state a claim as a matter of law. ECF 69-1. Moreover, it asserts that the absolute litigation privilege immunizes it from the defamation and tortious interference claims. *Id.* at 28-31, 37.

### 1. Defamation

In Count I of the Amended Counterclaim, defendants allege that State Farm made defamatory statements in claim denial letters to and oral communications with accident victims, their attorneys, and unspecified third parties. *See* ECF 65, ¶¶ 15, 17, 25-32. In the claim denial letters to accident victims and their attorneys, State Farm stated that it has denied their medical treatment claims "because the matters giving rise to the [medical treatment] charges are at issue in a pending civil lawsuit between [the Clinic] and State Farm." ECF 77-1 at 2. Additionally, in its oral communications with accident victims and unspecified third parties, State Farm allegedly stated that it has denied the medical treatment claims because (1) it "has filed a lawsuit against" the Clinics and Providers, ECF 65, ¶ 15, and (2) defendants "have [engaged] and are engaging in fraud and dishonesty." *Id.* ¶ 17.

Under Maryland law, "'[a] defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person.'" *Norman v. Borison*, 418 Md. 630, 645 n.10, 17 A.3d 697, 705 n.10 (2011) (citation omitted). The tort of defamation consists of four elements: "'(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.'" *Id.* (citations omitted). A statement is false if it was "'not substantially correct.'" *Piscatelli v. Van Smith*, 424 Md. 294, 306, 35 A.3d 1140, 1147 (2012) (quoting *Batson v. Shiflett*, 325 Md. 684, 726, 602 A.2d 1191, 1213 (1992)). The plaintiff bears the burden of establishing falsity. *Batson*, 325 Md. at 726, 602 A.2d at 1213.

"Maryland has retained the common law distinction between defamation *per quod* and defamation *per se*." *Sullivan v. City of Frederick*, JKB-17-1881, 2018 WL 337759, at *8 (D. Md. Jan. 9, 2018) (citing *Ind. Newspapers, Inc. v. Brodie*, 407 Md. 415, 441, 966 A.2d 432, 448 (2009)), *aff'd,* 738 F. App'x 198 (4th Cir. 2018). "Defamation *per se* is defamation on its face—i.e. the 'words themselves impute the defamatory character.'" *Sullivan*, 2018 WL 337759, at *8 (quoting *Metromedia, Inc. v. Hillman*, 285 Md. 161, 172, 400 A.2d 1117, 1123 (1979)). "In the case of defamation per quod, extrinsic facts must be alleged in the complaint to establish the defamatory character of the words or conduct." *Ind. Newspapers*, 407 Md. 441-42, 966 A.2d at 448 (citing *M&S Furniture Sales Co., Inc. v. Edward J. De Bartolo Corp.*, 249 Md. 540, 544, 241 A.2d 126, 128 (1968)).

"Although a plaintiff need not plead a defamation claim under the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, the pleadings in a defamation case must still be sufficiently detailed to enable a defendant to appropriately respond." *Estate of*

*Jones v. St. Thomas More Nursing & Rehab Ctr.*, PJM 09-1419, 2009 WL 3247929, at *3 (D. Md. Oct. 1, 2009); *see Hatfill v. New York Times Co.*, 416 F.3d 320, 329 (4th Cir. 2005) ("While the Federal Rules of Civil Procedure require more specific pleading in certain cases, defamation cases are not among them."). Thus, a "plaintiff may not baldly allege a broad course of conduct over a lengthy period of time and later sue on any act that occurred during that time period." *English Boiler & Tube, Inc. v. W.C. Rouse & Son*, Inc., 172 F.3d 862, 1999 WL 89125, at *3 (4th Cir. 1999) (unpublished table decision). Moreover, every "alleged defamatory statement constitutes 'a separate instance of defamation,' which 'a plaintiff must specifically allege.'" *Gainsburg v. Steben & Co.*, 838 F. Supp. 2d 339, 344 (D. Md. 2011) (quoting *English Boiler*, 1999 WL 89125, at *3); *see also Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 758 (D. Md. 2015) ("To satisfy federal pleading standards, a plaintiff must specifically allege each defamatory statement.").

State Farm maintains that the claim denial letters are protected by an absolute privilege. ECF 69-1 at 28-31. However, because the insurer does not assert the absolute or qualified privilege as to its alleged oral statements, I shall not consider whether the privileges apply to them. *Doe v. Johns Hopkins Health Sys. Corp.*, 274 F. Supp. 3d 355, 367 (D. Md. 2017) ("The qualified privilege is an affirmative defense[.]") (citing *Shapiro v. Massengill*, 105 Md. App. 743, 777, 661 A.2d 202, 219 n.11 (1995)). Even if the claim denial letters are not protected, State Farm contends they are not defamatory because they contain no false statements. ECF 69-1 at 24-26. It also maintains that the counterclaimants' allegations fail to allege sufficient facts to state a claim as to State Farm's alleged oral statements. *Id.* at 12.

"'An absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is

abused.'" *Smith v. Danielczyk*, 400 Md. 98, 117, 928 A.2d 795, 806 (2007) (quoting *Di Blasio v. Kolodner*, 233 Md. 512, 522, 197 A.2d 245, 250 (1964)). The absolute privilege "protects the person publishing the defamatory statement from liability even if his purpose or motive was malicious, he knew that the statement was false, or his conduct was otherwise unreasonable." *Adams v. Peck*, 288 Md. 1, 3, 415 A.2d 292, 293 (1980); *see Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766, 772 (4th Cir. 2018) ("'The witness had an absolute privilege [and] [t]he plaintiff could not recover even if the witness knew the statements were false and made them with malice.'") (quoting *Briscoe v. LaHue*, 460 U.S. 325, 330 (1983)).

Maryland recognizes an absolute privilege for three types of statements: (1) statements made in a judicial proceeding; (2) statements made in a quasi-judicial proceeding; and (3) statements made extrinsic to a judicial or quasi-judicial proceeding. *Norman*, 418 Md. at 650-56, 17 A.3d at 708-12. The extrinsic statements can be further divided into three categories, *id.* at 653, 17 A.3d at 710-11:

> (1) statements made with the direct purpose or effect of producing a judicial or quasi-judicial proceeding, e.g., a police brutality complaint, (2) statements "prepared for *possible* use in connection with a pending judicial proceeding," *Adams*, 288 Md. at 4, 415 A.2d at 294 (emphasis added), but which remain unfiled at the time of the alleged injury, and (3) statements that are not designed necessarily to produce a proceeding or cause one to be "filed," but which are connected contextually to a pending or ongoing proceeding.

In *Norman*, 418 Md. at 657-58, 17 A.3d at 713, the Maryland Court of Appeals concluded that a statement must satisfy a two-part test to fall within the third class of privileged extrinsic statements. First, "the contemplated or ongoing proceeding" must fulfill the test set-out in *Gersh v. Ambrose*, 291 Md. 188, 434 A.2d 547 (1981). *Norman*, 418 Md. at 657-58, 17 A.3d at 713. Pursuant to *Gersh*, 291 Md. at 197, 434 A.2d at 552, the court must evaluate: "(1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will

minimize the occurrence of defamatory statements." That is, the court must consider "the significance of 'the public interest sought to be advanced' and the protective trial-like attributes of the proceeding." *Norman*, 418 Md. at 653, 17 A.3d at 710 (quoting *Gersh*, 291 Md. at 196, 434 A.2d at 55).

After determining whether the proceedings satisfy *Gersh*, the court determines whether "the context of the statement demonstrates that it was made 'during the course of' the proceeding (i.e., while the putative tortfeasor was participating in the proceeding)." *Norman*, 418 Md. at 658, 17 A.3d at 713. When considering the context of the statement, courts ask, among other things: "[W]hat was the overall or general reason for the instrument or letter (but not the motive of the challenged statement itself . . .); what was the defendant doing when he or she made the statement; and to whom did he or she make the statement." *Id.* at 658, 17 A.3d at 713 (internal citation omitted).

Notably, the court evaluates the context in which the statement was made, not the statement itself. So, to "say a letter or email was sent, or a conversation was had 'during the course of a proceeding' is to say the letter, email, or conversation had some general 'relevance,' relationship, or connection to that proceeding. The specific alleged defamatory statement contained therein, however, need not have a similar relevance." *Id.* at 658 n.17, 17 A.3d at 713 n.17. If both prongs of the *Norman* test are satisfied and the proceeding is "'actually contemplated in good faith and under serious consideration[,]'" the absolute privilege applies to the extrinsic communication. *Id.* at 658, 17 A.3d at 714 (quoting RESTATEMENT (SECOND) OF TORTS § 588 cmt. e. (2006)).

State Farm maintains that its statements in the claim denial letters are contextually related to this suit and therefore privileged. ECF 69-1 at 28-29. Specifically, in the case *sub judice*, State Farm seeks judgment to stop paying claims for the counter-plaintiffs' medical services. And, in

its claim denial letters, State Farm explains that it is denying these claims because of this lawsuit. *Id.* at 30-31.

In response, the counter-plaintiffs assert that the claim denial letters "were not made solely in connection with a judicial proceeding." ECF 77 at 8. In their view, State Farm has "directed" patients and their lawyers to the "substantive defamatory statements made by State Farm [in the lawsuit] about the Defendants/Counter-Plaintiffs as if the statements were stated verbatim in the letters[.]" *Id.* at 8.

To determine whether the claim denial letters are privileged, the Court must apply the *Gersh* test to the relevant proceeding, *i.e.*, the instant case. First, the suit serves to advance a compelling government interest: the detection and prevention of fraud. Rooting out fraud benefits not only State Farm and its policyholders, but also patients in general, who might otherwise receive unnecessary, deficient, or even dangerous medical services from fraudulent medical providers. Indeed, the State has asserted its interest in the pursuit of fraud, requiring insurers to implement fraud detection measures and cooperate with the prosecution of insurance fraud cases. Ins. § 27-803(b). Second, an ongoing judicial proceeding is "[g]enerally . . . deemed to contain inherent safeguards against abuse of the [absolute] privilege." *Sodergren v. Johns Hopkins Univ. Applied Physics Lab.*, 138 Md. App. 686, 700, 773 A.2d 592, 601 (2001). The counterclaimants provide no basis for me to conclude that the normal safeguards are inadequate here. *See* ECF 77 at 23-25. Accordingly, this judicial proceeding satisfies the *Gersh* test.

Next, I consider whether the claim denial letters were made "during the course" of the proceeding, *i.e.*, whether they "had some general 'relevance,' relationship, or connection to that proceeding." *Norman*, 418 Md. at 658 n.17, 17 A.3d at 713 n.17. State Farm made the allegedly defamatory statements in the context of providing accident victims and their attorneys with a

justification for its denial of their medical expense claims. For example, in the letters, State Farm explains that it "is denying payment of these bill(s) because the matters giving rise to the charges are *at issue in a pending civil lawsuit between [the Clinic] and State Farm*." ECF 77-1 at 2 (emphasis added). In the letter, State Farm promises to "defend, indemnify, and hold . . . harmless" the accident victims for legal actions brought against them by a Clinic for collection of the denied medical treatment claims. ECF 77-1 at 2. The letter also states that State Farm told the Clinics about these promises to "defend, indemnify and hold . . . harmless." *Id.* The letters appear connected to the instant case in which State Farm seeks declaratory relief to deny payments for the counterclaimants' unpaid medical treatment claims.

But, even if the claim denial letters are not privileged, the counterclaimants do not plausibly allege the falsity of the statements in the letters. The counterclaimants allege that the following statement from the letters is defamatory: "At this time, State Farm . . . is denying payment of these bill(s) because the matters giving rise to the charges are at issue in a pending civil lawsuit between [the Clinic] and State Farm." ECF 77-1 at 2; *see also* ECF 77 at 21 n. 14. In support of the statement's falsity, the counter-plaintiffs direct the Court to several paragraphs in the Amended Counterclaim. *See* ECF 77 at 12 (citing ECF 65, ¶¶ 1, 10, 13, 22, 24, 26-32, 34, 35). None of these statements form an adequate basis for contesting the veracity of State Farm's statement. For the same reasons, the defamation claim also must fail as to State Farm's oral statements that it has denied medical expense payments because of the lawsuit.

As to the remaining oral statements, the Amended Counterclaim fails to allege enough facts to establish a plausible claim of defamation. The counterclaimants allege that "State Farm has and continues to state to third parties that it is refusing to pay PIP claims because the Medical Clinics, the Clinics' Owners and the medical professionals at the Clinics have and are engaging in fraud

and dishonesty." ECF 65, ¶ 17. Although defendants claim that State Farm has made this defamatory statement, they fail to allege even one specific instance of State Farm actually making the statement.

Although the Amended Counterclaim is not a model of clarity, the Court infers that the oral statements were allegedly made by State Farm employees to accident victims and their attorneys. *Id.* ¶ 23. But, the counterclaimants fail to name a single State Farm employee, accident victim, or attorney. Nor do they state whether the oral statements were made in-person or remotely. Moreover, the Amended Counterclaim fails to provide even one date on which the alleged statements were made. Instead, doing nothing more than "baldly alleg[ing] a broad course of conduct over a lengthy period of time," *English Boiler*, 1999 WL 89125, at *3, the counterclaimants assert that the oral statements were made at some time after State Farm filed the Complaint on December 14, 2017. ECF 65, ¶ 12 ("State Farm has since filing suit notified third parties expressly and by innuendo of its dishonesty and fraud claims[.]").

Further, the counterclaimants provide only a bare-bones rendering of what State Farm supposedly said. The Amended Counterclaim alleges that State Farm said that the counterclaimants "are engaging in fraud and dishonesty." ECF 65, ¶ 17; ECF 67 at 16 ("The content of the specific statements are that the Defendants/Counter-Plaintiffs are dishonest and engaged in fraudulent conduct."). But, they rely only "[o]n information and belief." ECF 65, ¶ 15.

To be sure, the counterclaimants need not plead detailed allegations as to each one of the who, what, where, and when, in order to state a claim. But, they must provide more than vague and hazy allegations as to at least some of these questions. Their failure to do so renders their pleading deficient. *See Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 542 (D. Md. 2006) (dismissing defamation claim when plaintiff alleged only that defendant told "persons associated"

with sales organizations that the defendant and his co-defendant "were taking legal action" against the plaintiff, "seeking substantial money damages").

## 2. Tortious Interference with Prospective Business Advantage

The counter-plaintiffs allege that State Farm has "disseminated injurious falsehoods" with the intention of causing accident victims and lawyers to stop referring injured persons to the Clinics for medical treatment. ECF 65, ¶¶ 34-36. As a direct result, they claim that they are losing patients and business. *Id.* ¶¶ 39.

The tort of intentional interference with contractual or business relations is "well-established in Maryland." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 296, 639 A.2d 112, 116 (1994). Broadly stated, it provides that "one not privileged to do so who purposely induces or causes a third person not to perform a contract or enter into or continue a business relation with another is liable for the harm caused thereby." *United Rental Equipment Co. v. Potts & Callahan Contracting Co.,* 231 Md. 552, 560, 191 A.2d 570, 574 (1963).

The Maryland Court of Appeals reiterated the elements of the tort in *Blondell v. Littlepage*, 413 Md. 96, 125, 991 A.2d 80, 97 (2010) (quoting *Kaser v. Financial Protection Marketing, Inc.*, 376 Md. 621, 628–29, 831 A.2d 49, 53 (2003)), as follows:

> A claim for intentional interference with contractual or business relations requires the following elements: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

"In any tort action, the plaintiff must establish that the defendant's tortious conduct was a cause in fact of the injury for which compensation is sought." *Med. Mut. Liab. Soc. of Maryland v. B. Dixon Evander & Assocs., Inc.*, 339 Md. 41, 54-55, 660 A.2d 433, 439-40 (1995); *see also Peterson v. Underwood,* 258 Md. 9, 16-17, 264 A.2d 851, 855 (1970) (stating that "[c]ausation in

fact is concerned with the . . . inquiry of whether defendant's conduct *actually* produced an injury"); *Abend v. Sieber,* 161 Md. 645, 649, 158 A. 63, 64 (1932). Thus, "the burden is on the plaintiff [or counter-plaintiff] to prove by a preponderance of the evidence that 'it is more probable than not that defendant's act caused his injury.'" *Evander*, 660 A.2d at 440 (quoting *Fennell v. Southern Maryland Hosp.,* 580 A.2d 206, 211 (Md. 1990)). In addition, the plaintiff must establish that any damages sought are a "natural, proximate and direct effect of the tortious misconduct." *Jones v. Malinowski,* 299 Md. 257, 269, 473 A.2d 429, 435 (1984).

The tort of tortious interference has "two general manifestations." *Macklin*, 334 Md. at 297, 639 A.2d at 117. The first manifestation is often described as "'inducing the breach of an existing contract,'" and the second, "more broadly, constitutes maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Blondell*, 413 Md. at 125, 991 A.2d at 97 (citation omitted). In other words, under Maryland law, one may claim tortious interference with a contract or, in the absence of a contract or breach of contract, one may claim tortious interference with business or economic relations.

The Maryland Court of Appeals has provided an illustrative list of "types of wrongful or unlawful acts that could form the basis" for the second manifestation of the tort. *Berry*, 360 Md. at 153, 757 A.2d at 113. These include "'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" *Id.*

"In order to sustain a claim for tortious interference with prospective advantage 'plaintiffs must identify a possible future relationship which is likely to occur, absent the interference, with specificity.'" *Mixter v. Farmer*, 215 Md. App. 536, 549, 81 A.3d 631, 638 (2013) (quoting *Baron*, 471 F. Supp. 2d at 546 (citing Maryland law)). "That is, a plaintiff '*must* establish some evidence

that a prospective business relationship is likely to occur.'" *Press v. United States*, JKB-17-1667, 2018 WL 1211537, at *9 (D. Md. Mar. 8, 2018) (quoting *Baron*, 471 F. Supp. 2d at 542) (emphasis in original). "After all, without this showing, it is unclear how any of the following elements could be established: causation, damages, or indeed the defendants' wrongful intent to interfere with the relationship." *Baron*, 471 F. Supp. 2d at 546 (internal citations omitted).

State Farm contends that the absolute litigation privilege shields it from suit. ECF 69-1 at 37. Further, State Farm asserts that the counterclaimants failed to allege facts sufficient to support a prima facie case of tortious interference with prospective business advantage. *Id.* at 38-39.

Maryland courts have only recently concluded that the absolute litigation privilege applies to claims of tortious interference with prospective business advantage. "Until 2013, every reported Maryland opinion about the absolute litigation privilege arose in the context of a defamation action[.]" *O'Brien & Gere Engineers, Inc. v. City of Salisbury*, 222 Md. App. 492, 510-11, 113 A.3d 1129, 1140 (2015), *aff'd*, 447 Md. 394, 135 A.3d 473 (2016). But, in *Mixter*, 215 Md. App. 536, 81 A.3d 631 (2013), the Maryland Court of Special Appeals concluded that the privilege immunized the defendant from claims of intentional infliction of emotional distress, tortious interference with contract, and tortious interference with prospective advantage. The claims arose from derogatory statements made by Farmer, a lawyer, about Mixter, also a lawyer, in letters "to other lawyers and to one of Mixter's former clients seeking information for an anticipated (and eventually filed) grievance with the Maryland Attorney Grievance Commission." *O'Brien*, 222 Md. App. at 511, 113 A.3d at 1140.

The *Mixter* Court noted that the Maryland Court of Appeals had applied other privileges to other tort claims. *See, e.g.*, *Carr v. Watkins*, 227 Md. 578, 583, 177 A.2d 841, 843 (1962)

(concluding that if the qualified immunity enjoyed by the defendant federal officer immunized him from liability for defamation, it also immunized him from liability for the other alleged torts); *Walker v. D'Alesandro*, 212 Md. 163, 169, 129 A.2d 148, 151 (1957) ("[Public official] [p]rivilege is not confined in the law of torts to matters of defamation[.]").  Further, it pointed to Supreme Court precedent concluding that privileges apply equally to defamation and other torts arising from the same actions. *See Hustler Magazine, Inc. v. Falwell*, 584 U.S. 46, 56 (1988) (concluding First Amendment privilege applied to libel and intentional inflection of emotional distress); *Barr v. Matteo*, 360 U.S. 564, 569 (1959) (characterizing privilege as an absolute defense for federal officers from suits for defamation and "kindred torts").

The *Mixter* Court also relied on the policy considerations underlying the absolute privilege. *Mixter*, 215 Md. App. at 547, 81 A.3d at 637.  It reasoned that the privilege was rooted in the need to protect the "'conduct of parties and/or witnesses in connection with a judicial proceeding.'" *Id.* (quoting *Sullivan v. Birmingham*, 416 N.E.2d 528, 534 (Mass. App. Ct. 1981)). The rationale for barring suits for defamation applies equally to other tort claims responding to the same speech.

Thereafter, in 2014, the Maryland Court of Appeals cited *Mixter* for the proposition that "[a]bsolute privilege is a broad defense to tort claims[.]" *Att'y Grievance Comm'n of Maryland v. Frost*, 437 Md. 245, 268 n.14, 85 A.3d 264, 277 n.14 (2014).  The Court of Special Appeals reiterated its support for extending the absolute privilege to other torts in *O'Brien*, 222 Md. App. at 522, 113 A.3d at 1147.  Reviewing the relevant case law in other states and circuit courts, the court identified "a strong trend favoring application of the absolute litigation privilege to immunize litigation participants from liability for any tort claim (not just defamation) that is based on words written or spoken in the course of a judicial proceeding." *Id.*

Therefore, in applying the litigation privilege, courts employ a substance-over-form analysis, considering "whether immunity from liability is consistent with and will serve the public policy objectives of the privilege, and [applying] the privilege when that is the case." *Id.* The "privilege rests on the vital public policy of the 'free and unfettered administration of justice.'" *O'Brien*, 447 Md. at 409, 135 A.3d at 482 (quoting *Adams*, 288 Md. at 5, 415 A.2d at 294).

Here, counter-plaintiffs' claims for defamation and tortious interference with prospective business advantage arise from the same claim denial letters and oral statements. Only the claim denial letters are privileged in regard to the count of defamation. To immunize State Farm's claim denial letters from liability for defamation, but not tortious interference, would allow the counter-plaintiffs to make an end run around the litigation privilege. "If it is desirable to create an absolute privilege in defamation . . . we should not remove one concern and saddle [defendants] with another for doing precisely the same thing." *Mixter*, 215 Md. App. at 547, 81 A.3d at 637; *Day*, 907 F.3d at 774 (quoting *O'Brien*, 222 Md. App. at 111, 113 A.3d at 1140) ("'[T]he precise theory of recovery is not [determinative]' of whether the immunity applies."). Therefore, applying the absolute litigation privilege to the tortious interference claim against State Farm's claim denial letters "'promote[s] the due administration of justice and free expression by participants in judicial proceedings.'" *O'Brien*, 222 Md. App. at 524, 113 A.3d at 1148 (quoting *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 378 (7th Cir. 2010)). Accordingly, insofar as the tortious interference claim is premised on the claim denial letters, those claim denial letters are privileged.

Even if the letters are not privileged, however, the Amended Counterclaim does not contain enough factual support to produce a viable claim based on the letters or oral statements. As discussed, counterclaimants have not alleged an actionable claim of defamation. To be sure, the statements need not be defamatory to support a claim of tortious interference. *See Doe v. Johns*

*Hopkins Health*, 274 F. Supp. 3d at 370 ("[T]he Court finds that Doe has 'stated a claim for intentional interference with business relations arising from the alleged negative statements . . . , regardless of whether those statements are specific enough to support a claim for defamation."). But, the Amended Counterclaim must at least include allegations of conduct primarily motivated by actual malice that was not merely "'incidental' to the 'pursuit of legitimate commercial goals.'" *Id.* at 370 (quoting *Alexander*, 336 Md. at 657, 650 A.2d at 271).

Counterclaimants have not adequately alleged that State Farm was motivated by actual malice when it made the alleged statements. Under Maryland law, Ins. § 27-303(6), it "is an unfair claim settlement practice . . . for an insurer to . . . fail to provide promptly on request a reasonable explanation of the basis for a denial of a claim[.]" As a result, State Farm maintains that it was legally obligated to inform its policyholders of the reason for the claim denial.

Even assuming the Amended Counterclaim adequately alleged malice, the count is still deficient, because it contains insufficient allegations as to the alleged conduct, *i.e.*, State Farm's dissemination of "injurious falsehoods" about the counterclaimants. ECF 65, ¶¶ 34-36, 38. The counterclaimants fail to name any attorneys who heard the allegedly defamatory statements or who stopped referring patients to the counterclaimants, nor any patients they lost as a result of State Farm's alleged statements. *Id.* ¶¶ 36-40; *see also Baron*, 471 F. Supp. 2d at 546 (dismissing count of tortious interference because the allegations were "vague and unformed" and only "hint[] at some damage to [plaintiff's] relationship with unidentified" sales organizations "at some future time in some future business [plaintiff] might have").

And, as discussed, the Amended Counterclaim provides little information about the oral statements. For example, the counterclaimants fail to provide more than bare-bones allegations

regarding persons with whom State Farm communicated, what State Farm said, and when State Farm uttered the alleged falsehoods.

### 3. Civil Conspiracy

Counter-plaintiffs allege that State Farm Mutual, State Farm Fire, and other unspecified persons or entities entered into a "civil conspiracy" to engage in tortious conduct against the counter-plaintiffs. ECF 65, ¶¶ 42-46. State Farm contends that "because the [other] Counterclaims fail to plead actionable torts, the civil conspiracy counts fail as a matter of law." ECF 69-1 at 33 (internal citation omitted).

A claim of civil conspiracy requires proof of three elements: "(1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of lawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damages resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154, 916 A.2d 257, 284 (2007) (quoting *Van Royen v. Lacey*, 262 Md. 94, 97-98, 277 A.2d 13, 14-15 (1971)); *see also Bellezza v. Greater Havre De Grace Yacht Club, Inc.*, No. 0367 Sept. Term 2014, 2015 WL 6394418, at *9 (Md. Ct. Spec. App. Oct. 22, 2015), *cert. denied*, 446 Md. 291, 132 A.3d 194 (2016). But, "civil conspiracy is not a 'separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.'" *Bellezza*, 2015 WL 6394418, at *9 (quoting *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 189, 665 A.2d 1038, 1045 (1995)); *see also Alexander*, 336 Md. at 645 n.8, 650 A.2d at 265 n.8.

Accordingly, a plaintiff must allege that he was injured by an overt tortious act done in pursuance of a conspiracy. *Alleco, Inc.*, 340 Md. at 189-90, 665 A.2d at 1045. In other words, "it is not . . . for simply conspiring to do the unlawful act that the action [of conspiracy] lies. It is for

doing the act itself, and the resulting actual damage to the plaintiff, that afford the ground of the action." *Id.* at 190, 665 A.2d at 1045 (quoting *Kimball v. Harman and Burch*, 34 Md. 407, 409, 1871 WL 4137, at *1 (1871)). Because the claims underlying the civil conspiracy claim have failed, counter-plaintiffs' civil conspiracy claim fails as well.

A viable civil conspiracy claim against State Farm Mutual and State Farm Fire is also barred by the intra-corporate conspiracy doctrine. In the Fourth Circuit, "[t]he law is well-settled . . . that a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility." *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986). Because State Farm Fire is a wholly-owned subsidiary of State Farm Mutual, the two entities are unable to form a conspiracy as a matter of law. *See* ECF 3, ¶ B; ECF 4, ¶ A; *cf. Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) (holding that a district court may "properly take judicial notice of its own records").

To the extent the civil conspiracy claim is premised on a conspiracy between the State Farm entities and unspecified "others," counter-plaintiffs fail to allege sufficient facts regarding the identity of these co-conspirators. Counter-plaintiffs speculate in their opposition that the conspiracy "may include the National Insurance Crime Bureau," ECF 77 at 33, but "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Mylan Laboratories, Inc. v. Akzo*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

### IV.   Conclusion

For the reasons set forth above, I shall deny the Clinic Motion and the Provider Motion, and I shall grant the State Farm Motion, with leave to amend.

An Order follows, consistent with this Memorandum Opinion.

Date: March 31, 2019

_____/s/_____
Ellen L. Hollander
United States District Judge